GENERAL STORES CORP. *v.* SHLENSKY ET AL.

No. 170.   Argued January 18, 1956.—Decided March 26, 1956.

*Aaron Rosen* and *Frederic P. Houston* argued the cause for petitioner.  With them on the brief was *Marks F. Paskes*.

*William H. Timbers* argued the cause for the Securities and Exchange Commission, respondent. With him on the brief were *Solicitor General Sobeloff, Thomas G. Meeker, David Ferber* and *Aaron Levy.*

*A. Alan Reich* argued the cause for Shlensky, respondent. With him on the brief was *Michael Gesas.*

*Max Goldweber* argued the cause for the Wage Claimants, respondents. With him on the brief was *Louis J. Weinshenker.*

*Leon Singer* argued the cause for the Creditors Committee, respondent. With him on the brief was *Samuel Blumberg.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioner instituted proceedings under c. XI of the Bankruptcy Act (52 Stat. 905, as amended, 11 U. S. C. § 701 *et seq.*) alleging it was unable to pay its debts as they matured. It proposed an arrangement of its general unsecured trade and commercial debts, none of which is evidenced by any publicly held security. Petitioner has indeed no debts of any nature by way of bonds, mortgage certificates, notes, debentures, or obligations of like character, publicly held. It does, however, have over 2,000,000 shares of $1 par value common stock listed on the American Stock Exchange and held by over 7,000 shareholders. One of these—an owner of 3,000 shares— and the Securities and Exchange Commission moved that the proceedings be dismissed unless, within a time fixed by the court, the petition be amended to comply with the requirements of c. X of the Bankruptcy Act (52 Stat. 883, as amended, 11 U. S. C. § 501 *et seq.*) for a corporate reorganization. The District Court granted the motions. 129 F. Supp. 801. The Court of Appeals affirmed by a

divided vote. 222 F. 2d 234. The case is here on certiorari. 350 U. S. 809.

Petitioner, formerly known as D. A. Schulte, Inc., has operated for some years a chain of stores for the sale of tobacco and accessory products. Petitioner has also had a chain of difficulties. Its financial problems go back at least to 1936 when it filed a petition for reorganization under former § 77B of the Bankruptcy Act. After its reorganization was completed in 1940, it had a few years of prosperity followed by a postwar decline in volume of business, a rise in costs, and substantial losses. During these years $600,000 cash was raised by the sale of stock and a new management installed with a view to converting some existing stores into candy, food, and drink establishments. That idea was abandoned and the proceeds of the stock sale were used for general corporate purposes. It was then decided to liquidate the existing specialty stores and to have petitioner acquire the stock of two existing retail drugstore chains—Stineway Drug Company and Ford Hopkins Company. The Stineway stock was acquired for $1,220,320, petitioner borrowing $870,-000 from Stineway for the purpose. Later petitioner borrowed an additional $440,000 from Stineway to help make the down payment on the Ford Hopkins stock, making a total indebtedness to Stineway of $1,310,000, represented by two non-interest-bearing notes. The Ford Hopkins stock was acquired for $2,800,000, the down payment being $735,000, the balance being payable in a yearly amount of $200,000 with 4 per cent interest and secured by the Stineway and Ford Hopkins stock.

While the two drug chains were being acquired, petitioner started the liquidation of its own stores, a process that was completed under c. XI of the Bankruptcy Act. The disposition of those stores involved the rejection of numerous leases and the creation of claims of landlords against petitioner.

The arrangement proposed by petitioner under c. XI would extend its unsecured obligations and provide for a 20 per cent payment on confirmation of the plan and 20 per cent annually for 4 years thereafter. The claims listed were the $1,310,000 debt to Stineway and $525,000 unsecured claims, exclusive of claims by landlords. We were advised on oral argument that during the course of the c. XI proceedings it was decided that this offer was not feasible and that the unsecured creditors are now offered the equivalent of 40 per cent of their claims in full satisfaction.

Much of the argument has been devoted to the meaning of *Securities and Exchange Commission* v. *United States Realty Co.*, 310 U. S. 434. In that case we held that relief was not properly sought under c. XI but that c. X offered the appropriate relief. That was a case of a debtor with publicly owned debentures, publicly owned mortgage certificates, and publicly owned stock. An arrangement was proposed that would leave the debentures and stock unaffected and extend the certificates and reduce the interest. It was argued in that case, as it has been in the instant one, that c. X affords the relief for corporations whose securities are publicly owned, while c. XI is available to debtors whose stock is closely held; that c. X is designed for the large corporations, c. XI for the smaller ones; that it is the character of the debtor that determines whether c. X or c. XI affords the appropriate remedy. We did not adopt that distinction in the *United States Realty* case. Rather we emphasized the need to determine on the facts of the case whether the formulation of a plan under the control of the debtor, as provided by c. XI, or the formulation of a plan under the auspices of disinterested trustees, as assured by c. X and the other protective provisions of that chapter, would better serve "the public and private interests concerned including those of the debtor." 310 U. S., at 455. The *United*

*States Realty* case presented a rather simple problem. There one class of creditors was being asked to make sacrifices, while the position of the stockholders remained unimpaired (*id.*, 453–454, 456), contrary to the teachings of *Case* v. *Los Angeles Lumber Products Co.*, 308 U. S. 106. Moreover, the history of the company raised a serious question "whether any fair and equitable arrangement in the best interest of creditors" could be effected "without some re-arrangement of its capital structure." *Id.*, 456. For those reasons c. X was held to offer the appropriate relief.

The character of the debtor is not the controlling consideration in a choice between c. X and c. XI. Nor is the nature of the capital structure. It may well be that in most cases where the debtor's securities are publicly held c. X will afford the more appropriate remedy. But that is not necessarily so. A large company with publicly held securities may have as much need for a simple composition of unsecured debts as a smaller company. And there is no reason we can see why c. XI may not serve that end. The essential difference is not between the small company and the large company but between the needs to be served.

Readjustment of all or a part of the debts of an insolvent company without sacrifice by the stockholders may violate the fundamental principle of a fair and equitable plan (see *Case* v. *Los Angeles Lumber Products Co.*, *supra*), as the *United States Realty Co.* case emphasizes.

Readjustment of the debt structure of a company, without more, may be inadequate unless there is also an accounting by the management for misdeeds which caused the debacle.

Readjustment of the debts may be a minor problem compared with the need for new management. Without a new management today's readjustment may be a temporary moratorium before a major collapse.

These are typical instances where c. X affords a more adequate remedy than c. XI. The appointment of a disinterested trustee (§ 156), his broad powers of investigation (§ 167), the role of the trustee in preparing a plan (§ 169), the duty of the Securities and Exchange Commission to render an advisory report on the plan (§ 172), the requirement that the plan be "fair and equitable, and feasible" (§§ 174, 221), the power to include the subsidiaries, Stineway and Ford Hopkins, in the reorganization of petitioner (§ 129)—these are controls which c. X gives to the entire community of interests in the company being reorganized and which are lacking under c. XI. These controls are essential both where a complicated debt structure must be readjusted and where a sound discretion indicates either that there must be an accounting from the management or that a new management is necessary. Those conditions only illustrate the need for c. X. There may be others equally compelling.

The history of this debtor indicates not fraud but either an improvident overextension or a business that has been out of step with modern trends. One corporate reorganization has already been suffered. Heavy short-term loans hang ominously over the company; and it has been converted from an operating company to a holding company with the shares of the subsidiaries pledged to creditors. It is argued that only a short moratorium is needed. There are, however, fears that a short moratorium may be merely a prelude to new disasters, that what the company needs is a fundamental reorganization of its capital structure, so that its limited cash resources will not be dissipated in an effort to meet the demands for debt reduction. A question as to what is "fair and equitable" between creditors and stockholders may eventually be reached in the reorganization. But the paramount issue at present concerns what is "feasible." A "feasible" plan within the meaning of c. X, §§ 174, 221, might mean, first,

a merger of the subsidiaries with the holding company, and, second, a funding of the unsecured debt and a realignment of debt and stock so as to give a balanced capital structure. The old business has been liquidated and the new one launched with heavy borrowings on a short-term basis. If the new one is to succeed, it may well need a more thoroughgoing capital readjustment than is possible under c. XI. That was the view of two lower courts. We could reverse them only if their exercise of discretion transcended the allowable bounds. We cannot say that it does. Rather we think that the lower courts took a fair reading of c. X and the functions it serves and reasonably concluded that this business needed a more pervasive reorganization than is available under c. XI.

*Affirmed.*

MR. JUSTICE HARLAN took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BURTON joins, dissenting.

This is a proceeding for confirmation of an arrangement under Chapter XI of the Bankruptcy Act, 11 U. S. C. § 701 *et seq.* The controlling facts are these. Petitioner is a corporation with a simple capital structure, with its common stock, which is traded on the American Stock Exchange, held in the hands of 7,000 stockholders. The proposed arrangement exclusively affects the unsecured creditors, including wage earners whom the Bankruptcy Act accords priority of payment. All these creditors strongly support confirmation of the arrangement. The Securities and Exchange Commission, in its capacity of protector of public investors, opposed the resort to Chapter XI and insisted on the reorganization procedure defined by Chapter X. The stockholders themselves have not opposed the arrangement, barring only a single stock-

holder representing two-tenths of one percent of the common stock of the debtor. There is no suggestion of fraud or other improper behavior on the part of the management of the debtor, which has suffered business misadventure apparently attributable to changes in consumer response to the type of business conducted by the original Schulte tobacco stores. The District Court dismissed the petition under Chapter XI, with leave to the debtor to meet the requirements of reorganization under Chapter X.* 129 F. Supp. 801. A divided Court of Appeals sustained the District Court, 222 F. 2d 234, and its judgment is here affirmed.

The essence of this Court's decision is that the District Court acted as it did in the exercise of allowable discretion. But if the exercise of discretion by the District Court was guided by inappropriate standards, its exercise of discretion is left without a supporting basis and cannot stand. Such, I believe, is the situation here.

The District Court was set on its course by what it deemed the guiding ruling of this Court in *Securities and Exchange Commission* v. *United States Realty & Improvement Co.,* 310 U. S. 434. But the usually careful district judge misconceived the demands of that case upon him by relying on some general observation without the qualifying illumination of the literary and factual context of what he quoted from the opinion in that case. The District Court found guidance in the statement that "the two chapters [X and XI] were specifically devised to afford different procedures, the one adapted to the reor-

---

*At the time of the *Realty* decision, if a proceeding was found to have been improperly brought under Chapter XI, it had to be dismissed and a proceeding started anew under Chapter X. Section 30 of the Act of July 7, 1952, amended the law so as to allow a transfer of a Chapter XI proceeding, if improperly filed thereunder, to Chapter X. 66 Stat. 420, 432, and see H. R. Rep. No. 2320, 82d Cong., 2d Sess. 19.

ganization of corporations with complicated debt structures and many stockholders, the other to composition of debts of small individual business and corporations with few stockholders . . . ." 310 U. S. 434, 447.

In the first place, his quotation breaks into a sentence, which plainly enough indicated that what the district judge quoted was not the *ratio decidendi* of the *Realty* case but a loose generality. The district judge left unquoted the qualifying introduction, "While we do not doubt that in general," with the further cautionary phrase, "as will presently appear more in detail . . . ." The later details derive significance from the wholly different set of facts in the *Realty* case. In that case the arrangement for which shelter was sought under Chapter XI involved changes affecting security holders, and those changes, the Court found, easily might adversely affect the creditors. This precluded a finding that the arrangement was "for the best interests of the creditors," which is an essential requisite for confirmation. The Court was very careful to say that the application it gave to Chapter XI in the *Realty* case "does not mean that there is no scope for application of that chapter in many cases where the debtor's financial business and corporate structure differ from respondent's." 310 U. S., at 454.

Again, while what was quoted from the *Realty* case by the district judge seemed to indicate a sharp line between corporations "with many stockholders" and corporations "with few stockholders," assigning Chapter X to the former and restricting Chapter XI to the latter, the opinion in the *Realty* case went on to say (what was not quoted below), "we find in neither chapter any definition or classification which would enable us to say that a corporation is small or large, its security holders few or many, or that its securities are 'held by the public,' so as to place the corporation exclusively within the jurisdiction of the

court under one chapter rather than the other." 310 U. S., at 447.

The upshot of the matter is that a critical reading of the extended opinion in the *Realty* case requires the conclusion that all its general observations must be limited to the particular situation which elicited them. And yet, the controlling consideration in the District Court's dismissal of the Chapter XI proceeding is fairly attributable to the fact that the plan of arrangement concerned "a corporation with 7,000 holders of two and a quarter million shares of stock listed on the American Stock Exchange and recently selling at under two dollars a share." 129 F. Supp. 801, 805. Such a basis for judgment disregards the informal, efficient, and economical procedure for financial readjustments of a corporation with its creditors where no change in the capital structure is involved, where no charge of impropriety in corporate management is intimated, where all the creditors urge that the proposed arrangement is for their "best interests" (§ 366 of the Chandler Act, 52 Stat. 840, 911), and where a refusal to entertain the arrangement would work real hardship to 174 wage claimants.

Not only was the District Court's exercise of discretion against entertainment of the Chapter XI proceeding based on a misconception of the holding in the *Realty* case. It was also in disregard of the amendment to Chapter XI by § 35 of the Act of July 7, 1952, 66 Stat. 420, 433. By that amendment Congress eliminated the requirement that a plan of arrangement had to be "fair and equitable." That requirement was in Chapter XI, as it stood at the time of the *Realty* decision, and by it Congress had written into Chapter XI the absolute rule for equity reorganizations laid down by this Court in *Northern Pacific R. Co.* v. *Boyd,* 228 U. S. 482, and *Case* v. *Los Angeles Lumber Products Co.,* 308 U. S. 106. (H. R. Rep. No. 2320, 82d

Cong., 2d Sess. 21.) Even if the "fair and equitable" rule were still in Chapter XI, there is nothing in the facts of this case to show that the arrangement would not satisfy that requirement, for we have noted that the plan of arrangement here, unlike the situation in *Realty,* leaves untouched the position of the security holders. Since the *Realty* decision to no small degree turned on the enforcement of the "fair and equitable" rule, it is noteworthy that no consideration was given by the lower courts, and none is given by this Court, to the significance of this amendment by Congress. One would suppose that the elimination, in 1952, of this drastic requirement is the clearest possible indication that Chapter XI should be given a more generous scope than even the narrowest reading of *Realty* might suggest. Chapter XI should not be shriveled in its availability.

I would reverse the Court of Appeals.