In the Matter of **MANUFACTURERS' CREDIT CORPORATION** et al., Debtors.

No. B. 1085–67.

United States District Court
D. New Jersey.

Jan. 10, 1968.

Richard V. Bandler, Marvin E. Jacob, New York City, for S. E. C.

Furst, Furst, Feldman & Benenson, by Jay Benenson, Newark, N. J., for debtors.

Okin, Pressler & Sherby, by Harold Okin, Ridgefield, N. J., Leinwand, Maron & Hendler, by Isadore Leinwand, New York City (N. Y. Bar), for Creditors Committee.

Riker, Danzig, Scherer & Brown, by Charles Danzig, Newark, N. J., Milbank, Tweed, Hadley & McCoy, by Samuel Ballin, New York City (N. Y. Bar), for Chase Manhattan Bank.

Ravin & Ravin, by Morris Ravin, Jack L. Cohen, Newark, N. J., for receiver.

Winne & Banta, by Howard Corbitt, Hackensack, N. J., for Peoples Trust Co.

Stickel, Kain & Stickel, by Harold Kain, Newark, N. J., for American Oil Co.

Charles Seligson, New York City (N. Y. Bar), for Sidney Engelhardt.

Cole, Berman & Garth, by Leonard Garth, Paterson, N. J., receiver for Theodore Richmond.

## OPINION

WORTENDYKE, District Judge.

This case came before me upon return of an Order to Show Cause allowed to the Securities and Exchange Commission (S.E.C.), directing the parties to the captioned Chapter XI proceeding to show cause why leave should not be granted to the S.E.C. to intervene therein, and why the proceeding should not be dismissed unless the petitions of the debtors under Chapter XI be amended, or a creditors'

petition be filed to conform the proceedings to the provisions of Chapter X (11 U.S.C. § 728).

· Briefs were filed in behalf of various parties in interest, and oral argument was heard upon the return of the Order to Show Cause on November 3, 1967. The motion for leave to intervene was granted at the conclusion of the oral argument, but decision was reserved upon the application to dismiss the Chapter XI proceeding pending the filing and consideration by the Court of an anticipated report from Puder and Puder, Certified Public Accountants, which had been ordered by the Receiver appointed by the Referee in the Chapter XI proceeding, respecting the affairs of the debtors. That accountant's report has not yet been filed, but S.E.C. urges that the Court decide the still pending aspect of its motion without further delay. The Court accedes to the request and concludes, upon the record before it, that the relief sought by S.E.C. should be granted in full.

The Order to Show Cause was allowed upon facts disclosed in the affidavit of Marvin E. Jacob, an attorney for S.E.C. from which affidavit it appears that on August 1, 1967 two petitions were filed under the Bankruptcy Act relating to Manufacturers' Credit Corporation (M.C.C.). The first of these petitions was involuntary, under Chapter X, by three unsecured creditors of M.C.C. That petition was dismissed on August 17, 1967. The second petition filed on August 1 was voluntary, by M.C.C. and nineteen of its subsidiary and affiliated corporations, under Section 322 of Chapter XI of the Act (11 U.S.C. § 722). The matter was referred generally to Referee William Lipkin, who appointed Joseph Thieberg receiver of the twenty petitioning debtors. By further orders of the Referee the proceedings and receiverships were extended to include six additional affiliated or subsidiary corporations of M.C.C. On or about October 31, 1967 a plan of arrangement was filed in behalf of the twenty-six debtors. S.E.C. contends, and this Court agrees,

that the Chapter XI proceeding should be dismissed and transferred to Chapter X on the grounds that it should have been brought under Chapter X of the Act (11 U.S.C. § 728) and that adequate relief is not obtainable under Chapter XI (11 U.S.C. § 546(2)) as evidenced, in part, by the proposed arrangement which is not in compliance with Section 366(2) of the Act (11 U.S.C. § 766(2)). That Section provides that the Court shall confirm an arrangement if satisfied that " * * * (2) it is for the best interests of the creditors and is feasible; * * *." The proposed arrangement, in my opinion, meets neither of these requirements.

Since the appointment of the Receiver, the debtors have continued to operate their businesses under his supervision. Schedules and statements of affairs were filed by the 26 debtors on August 28, 1967, and several examinations have been conducted by the Receiver under Section 21(a) of the Bankruptcy Act (11 U.S.C. § 44(a)). The outstanding capital common stock of each of the debtors is owned directly or indirectly by Theodore J. Richmond, who is president of each of the corporations, and by his wife and two daughters. He owns 55% of the stock and they the balance. We are informed that Referee Lipkin has appointed a Receiver for Richmond in the separate proceedings for arrangement under Chapter XI of the Bankruptcy Act.

M.C.C. was incorporated in 1932 in New Jersey and commenced business as a finance company. It discontinued that business some time prior to 1948, when it became a holding company and began to sell unsecured promissory notes to members of the public for the purported purpose of financing the development and operation of other corporations subsidiary to and affiliated with M.C.C. The principal office of each of the debtors, excepting Orange & Black Bus Lines, Inc. (hereinafter Orange & Black), Fairview Motor Repairs (hereinafter Fairview) and Fairtrans Realty Corp. (hereinafter Fairtrans) is at 730 Madison Avenue, Paterson, New Jersey. The principal office of Orange & Black, Fairview and

Fairtrans is at 419 Anderson Avenue, Fairview, New Jersey, but the affairs of all of the 26 debtors herein have been continuously controlled by Richmond, as President of each of them, until the date of the filing of the original petitions under Chapter XI.

Most of the debtors are engaged directly or indirectly in operating interstate and intrastate bus lines. Seven of the debtors are in interstate and intrastate bus operations. Four own real estate used in connection with those bus operations. Four own buses and other equipment used in connection with those operations. Nine debtor corporations, including M.C.C. are or were engaged in financing. One debtor is a transportation broker, and another owns real estate in New Jersey not used in connection with the bus operations.

Excepting Orange & Black, which owns some of the buses which it operates, the interstate and intrastate lines do not own the buses which they operate, but rent their equipment from subsidiary or affiliated corporations engaged in the business of bus leasing. Fairview leases equipment to Orange & Black; Warwick Coaches, Inc. (hereinafter Warwick) leases to Warwick-Greenwood Lake & N. Y. Transit Inc. (hereinafter Warwick-Greenwood); and Washington Corp. (hereinafter Washington), and New Jersey-New York Transit Co., Inc. (hereinafter New Jersey-New York) lease to the remainder of the operating companies.

The operating bus companies do not own the garages, parking lots or terminals which they use, but they rent such facilities from affiliated companies engaged in the real estate business. Fairtrans Realty Corp. (Fairtrans) owns the garage which houses the Orange & Black buses. Monroe Securities Corp. (Monroe) and Jaytee Securities Corp. (Jaytee) own garages and parking lots used in connection with the remaining bus operations.

Clifton Terminal Corp. (Clifton) owns a building located on leased land in Rutherford, New Jersey, which was used as a bus terminal. Real estate owned by Donal Inc. is not used in connection with any of the bus operations and presumably is held as an investment by the owner. That real estate is commercial property situated in Paterson, New Jersey, and consists of seven buildings occupied by 26 tenants, yielding a net annual income of $180,000. Orblack Securities Corp. (Orblack) and Waldwick Realty Co., Inc. (Waldwick) are holding companies owning, respectively, all of the stock of Orange & Black and Warwick-Greenwood. Inter-City Tours, Inc. (Inter-City) owns no equipment but holds an I.C.C. license to conduct a package tour business as a broker.

Each of the corporations involved in the financing business was employed by Richmond as an instrumentality through which to borrow substantial amounts of money from members of the public through the sale of unsecured promissory notes bearing interest rates ranging from 12% to 15% and maturing generally in three years.

A combined balance sheet of the debtors, compiled from their filed schedules, discloses, as of August 28, 1967, total assets of $136,217,309 and total liabilities of $120,660,618. Actual tangible assets amount to $10,000,000 not including value of franchises. Liabilities, exclusive of amounts owed to Richmond and intercompany debt ($54,716,433) aggregate $65,950,361. In his Section 21(a) testimony, Richmond stated that $48,269,851.43 of the claims of unsecured creditors represents money borrowed by him personally which was paid by the lenders by check to the order of M.C.C., which, in turn, paid over the amounts to him, and out of which he paid all interest charges and other expenses. M.C.C. was represented as the nominal borrower to preclude the availability of the defense of usury. The debtors began borrowing money from the public in 1948. By 1954 their aggregate principal debt outstanding had reached about $400,000. Since then the amounts borrowed, ostensibly by M.C.C., have increased to more than $48,000,000 from approximately 4000 lend-

388

ers. In addition to M.C.C., 8 of its affiliated subsidiaries (Intercity, Mondrich, Washington, Transit, Monroe, Inter-State, TeJay and TeeJay A.R.) now owe more than 900 lenders in amounts aggregating $9,646,644.

Orblack was formed to purchase the stock of Orange & Black and Fairview for $860,000. This amount was ostensibly paid by M.C.C., but charged against Richmond's account with M.C.C. Other corporations were not handled in the same manner. Washington operated "on its own" because it was a leasing company with its own assets. M.C.C. had no assets except stock of operating companies. In some instances, however, public loans were made directly to Washington, and guaranteed by M.C.C. or by Richmond. He has a personal claim against M.C.C. (in addition to the $48,269,851.43 which it owes to other unsecured general creditors) for $4,127,000, based upon loans allegedly made by him to M.C.C. without interest.

■ No registration statement required by the Securities Act of 1933 was ever filed with S.E.C. by M.C.C. or its affiliates in connection with the sale of any of these securities. They are not exempt from registration under 15 U.S.C. § 77c. The payments required by the terms of these notes in the year immediately preceding the filing of the Chapter XI petitions amounted to approximately $6,000,000 in interest for that year and an equal amount for principal maturities therein. Thus the debt structure of $48,000,000 required $12,000,000 for its servicing. The profits of $300,000 earned by the operating bus companies were insufficient to service such indebtedness. Therefore new notes were sold, the proceeds of which were used to service the old ones. Thus resulted a distribution by different issuers, among 5000 persons of $58,000,000 of notes bearing differing interest rates and differing maturities. For the purpose of procuring investors, bonuses or commissions were paid to persons serving as "finders" who brought investors in. These "finders fees" averaged from 12% to 14% for the 19-year

period during which the borrowing practice had been pursued. The proposed arrangement involves a very major alteration of public debt held by very numerous public investors totally unfamiliar with the debtors' operations. Procedure under Chapter X is prima facie requisite. Securities and Exchange Commission v. Canandaigua Enterprises Corp., 339 F.2d 14 (2 Cir. 1964); Securities and Exchange Commission v. Liberty Baking Corp., 240 F.2d 511 (2 Cir.) cert. den. 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed.2d 723 (1957).

By the terms of their plan of arrangement, the debtors, through Richmond, their President, essentially agree to pay all general unsecured creditors, in full settlement of their respective claims, by issuing new promissory notes for the amounts of their respective claims reduced by progressively diminishing percentages in accordance with an arbitrary classification of such creditors based upon the date prior to which the members of such class advanced monies to the debtors. That is to say:

1. Creditors who advanced monies prior to August 2, 1960 will have their claims reduced by 42%.

2. Creditors who advanced monies prior to August 2, 1961 will have their claims reduced by 35%.

3. Creditors who advanced monies prior to August 2, 1962 will have their claims reduced by 28%.

4. Creditors who advanced monies prior to August 2, 1963 will have their claims reduced by 21%.

5. Creditors who advanced monies prior to August 2, 1964 will have their claims reduced by 14%.

6. Creditors who advanced monies prior to August 2, 1965 will have their claims reduced by 7%.

7. Creditors who advanced monies on or after August 2, 1965 will receive notes for the full amount of their claims.

M.C.C. will increase its authorized capital stock to 1,000,000 shares without par value. 90% of such stock will be desig-

nated Class "A" and 10% thereof Class "B". Class "A" stock will be issued to representatives of the unsecured creditors to be held in trust or distributed on a pro rata basis for the benefit of such creditors. Soli Furhman, the son-in-law of Mr. Richmond, will receive the Class "B" stock of M.C.C. A Board of Directors of M.C.C. consisting of nine members will be selected. Seven members will be selected by the Class "A" stockholders and two members by the Class "B" stockholder. Class "A" stock is to be preferred to the Class "B" stock with respect to dividends and liquidation. The Class "B" stockholder, Soli Furhman, will waive all rights under N.J.S.A. 14:14–3 (authorizing disablement of an insolvent corporation from exercising its franchise upon a showing that its corporate privileges are being abused). The issuance of the stock under the Plan shall be free of the registration requirements of Section 77e of Title 15 of the United States Code. Monies due the unsecured note holders are to be subordinated to all obligations incurred by the debtors on and after the confirmation of the Plan. In the event of liquidation of the debtors' assets the creditors subject to the Plan may receive payment of any balance due them only after new creditors, whose *claims arise after the confirmation of* the Plan, are paid in full. The Plan further contemplates the establishment of a sinking fund out of the operating profits of the debtors, and that each year the Board of Directors may determine the amount to be distributed to the unsecured note holders. Soli Furhman shall be employed by contract with the Board of Directors to manage the operation of the debtors. The provision that the Class "A" stock will be issued to representatives of the unsecured creditors to be held in trust or distributed on a pro rata basis for their benefit is non-specific and obscure. Who shall be the representatives of the unsecured creditors, how such representatives shall be selected and what shall be their powers and duties is not stated, nor is any valuation per share of stock fixed as a divisor

for purposes of computing the number of shares distributable against the amount of a creditor's proven claim.

The common characteristics of a Chapter XI plan were pointed out in Securities and Exchange Commission v. American Trailer Rentals, 379 U.S. 594, at 605, 85 S.Ct. 513, at 520, 13 L.Ed.2d 510 (1965):

"The formulation of the plan of arrangement, * * * for all practical purposes is in the hands of the debtor, subject only to the requisite consent of a majority in number and amount of unsecured creditors, * * * and the ultimate finding by the court that the plan is, *inter alia,* 'for the best interests of the creditors,' * * *."

As was emphasized in both *American Trailer,* supra, and Securities and Exchange Commission v. United States Realty & Improvement Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed 1293 (1940) the process of formulating an arrangement and the solicitation of the consent of creditors sacrifices to speed and economy every safeguard in the interest of the thoroughness and disinterestedness provided in Chapter X:

"The plan of arrangement is proposed by, and only by, the debtor, * * * and creditors have only the choice of accepting or rejecting it. Acceptances may be solicited by the debtor even before filing of the Chapter XI petition and, in fact, must be solicited before court review of the plan, * *. There are no provisions for an independent study by the court or a trustee, or for advice by them being given to creditors in advance of the acceptance of the arrangement. In short, Chapter XI provides a summary procedure whereby judicial confirmation is obtained on a plan that has been formulated and accepted with only a bare minimum of independent control or supervision." Goldberg, J., in *American Trailer,* supra, 379 U.S. at p. 606, 85 S.Ct. at p. 520.

The provision of the suggested Plan for the payment of the general

unsecured creditors by promissory notes of the debtors in Class "A" stock of M.C. C. is neither for the best interests of creditors nor feasible. The unsecured creditors already hold promissory notes for their loans, and the increase in the number of shares into which the capital stock of M.C.C. is to be divided merely proportionately diminishes the value of the interest of the holder of each share in the business of a corporation without physical assets which is presently insolvent. More specifically stated, an unsecured creditor of M.C.C. or one of its subsidiaries has presently only a promise to pay the principal and interest of the creditor's loan by the maker of the note. The substitution of a new note for that already held by the creditor in an amount less than the original note and more or less than that of a new note to other unsecured creditors whose claims arose upon loans to the debtors or one of them is not in the best interests of the unsecured creditors as a group. The proposed plan provides for the establishment of a sinking fund out of the operating profits of the debtors, but leaves to the determination of the Board of Directors of the corporation the amount to be distributed to the unsecured-creditor note holders. According to the schedules annexed to its petition for arrangement, M.C.C. conducts no business, owes $52,396,951.43 and has assets totalling $57,463,816.56. These assets consist only of stock of its affiliated companies and accounts receivable from such affiliated companies for advances thereto. The proposed plan does not indicate the source or sources of the operating profits of the debtors out of which the sinking fund is to be created from which the distributions to the unsecured creditors are to be made. Whether the business of any of M.C.C.'s subsidiaries or affiliates may be expected to yield profits to M.C.C. will be determinable only through an examination of the past and current operations of the debtors and the reciprocal claims and credits among them. The Plan under consideration therefore is insufficient to enable the court to find that the provisions thereof are for the best interests of the creditors. As in *American Trailer,* supra, (p. 606, 85 S.Ct. p. 520) there are no provisions for an independent study or for advisory recommendations by the court to the creditors in advance of their acceptance of the arrangement.

Sidney Engelhardt, Emanuel Engelhardt and Isidore Engelhardt (Engelhardt) are creditors of Orblack and hold purchase money security interests in the outstanding capital stock of Orange & Black and of Fairview. Kenron Co., a partnership (Kenron) is a creditor of Fairtrans Realty Corp. (Fairtrans), and is the holder of a purchase money mortgage lien upon the real property owned by Fairtrans. Engelhardt and Kenron oppose the pending application of S.E.C. insofar as it relates to Orblack, Orange & Black, Fairview and Fairtrans upon the following grounds: (1) the contemplated consolidation of assets and liabilities of the 26 debtors destroys the corporate integrity of each of their distinct entities and the rights of Engelhardt and Kenron to rely upon the same; (2) such consolidation of assets and liabilities would constitute the taking of property and deprivation of rights relied upon by Engelhardt and Kenron in dealing with Orblack, Orange & Black, Fairview and Fairtrans without due process of law; (3) Orblack, Orange & Black, Fairview and Fairtrans are solvent and without public debt, and their assets should not bear the expense of a Chapter X proceeding to the prejudice of Engelhardt and Kenron and their other creditors; (4) a petition under Chapter X cannot be filed in "good faith" by or against Orblack, Orange & Black, Fairview and Fairtrans because the Engelhardts are the only creditors of Orblack, and Orange & Black, Fairview and Fairtrans and are solvent and can pay their respective debts as they mature. Therefore, Engelhardt and Kenron join with S.E.C. in urging that the pending Chapter XI proceedings be dismissed as to Orblack, Orange & Black, Fairview and Fairtrans; but Engelhardt and Kenron oppose the granting of leave to file Chapter X petitions with respect to said alleged debtors. In the alternative, Engelhardt and Kenron

pray that any Chapter X petition which may be ordered filed be separate from and limited to the affairs and property of each of said alleged debtors.

The affidavit of Sidney Engelhardt discloses as follows: On September 30, 1964 Engelhardt sold to Orblack, the issued and outstanding capital stock of Orange & Black and Fairview for the respective sums of $860,000 and $120,000. As of October 11, 1967 Orblack was indebted to Engelhardt on account of the price of the Orange & Black stock in the amount of $700,439.12, and on account of the price of the Fairview stock in the amount of $95,121.11. These outstanding balances are payable over a 12-year period and are secured by purchase money pledges and liens in favor of the Engelhardts on the capital stock of Orange & Black and Fairview. Also on September 30, 1964, Kenron sold to Fairtrans real estate located at 419 Anderson Avenue, Fairview, New Jersey. As of October 11, 1967 Fairtrans owed Kenron a balance of $345,895.93 on account of the purchase price of the real estate which also is payable over a period of 12 years and is secured by a purchase money mortgage held by Kenron. Orblack is a holding company and has no creditors other than Engelhardt. Orange & Black owns buses and operates bus lines under interstate and intrastate franchises. Fairview leases bus equipment to Orange & Black. Fairtrans owns the premises upon which are constructed the garage and other facilities used by Orange & Black and Fairview. Prior to August 1, 1967, all of these corporations (Orblack, Orange & Black, Fairview and Fairtrans) paid their debts as they matured. None of these four corporations sold unsecured notes to the public or borrowed from the public at large. They have no public debt nor are their securities publicly held. They are not charged with issuing false financial statements and such capital structures as each of these corporations has is not complex. The businesses of Orblack, Orange & Black, Fairview and Fairtrans are separate and distinct from the businesses operated by M.C.C. and the other 21 debtor corpora-

tions. Orange & Black operates a separate and distinct bus line, unrelated to Inter-City, which is the primary operating unit of the other 22 debtor corporations. In their dealings with Orblack, Orange & Black, Fairview and Fairtrans, Engelhardt and Kenron bargained for and relied upon the separate and distinct corporate entities represented by those corporations and upon their property and assets.

■ Where, as here, several debtor corporations are all owned or controlled by one person, and operated as a single unit, with little or no attention paid to the formalities usually observed in independent corporations, and the officers and directors of all of the corporations are substantially the same, and funds were shifted back and forth between the corporations in an extremely complex pattern and, in effect, pooled together with loans being made back and forth, borrowings made by some to pay obligations of others, and withdrawals made from and to corporate accounts by the individual in control of all were not sufficiently recorded on the books of the respective corporate entities, auditing of the financial condition of the corporations and investigation of the intercompany relationships would entail great expenditure of time and expense without assurance that a fair reflection of the conditions of the debtor corporations would in the end be possible. Accordingly a Chapter X reorganization court may consolidate the administration and the assets and liabilities of the separate corporations. Chemical Bank New York Trust Company, Trustee v. Kheel, 369 F.2d 845 (2 Cir. 1966). If Orblack, Orange & Black, Fairview and Fairtrans are not insolvent they may plead by answer under § 137 of the Act (11 U.S.C. § 537) seeking a dismissal under 144 of the Act (11 U.S.C. § 544).

■ As indicated by the facts outlined above, in the present case, as in *American Trailer*, supra, we are dealing with investor-creditors and a large public debt. The general rule set out in *United States Realty*, supra, and specifically re-

affirmed by *American Trailer*, supra, that Chapter X is the appropriate proceeding for adjustment of publicly held debt is definitely applicable to the case at bar. Likewise the factual picture here disclosed does not fall within the narrow exceptions to this general rule announced in General Stores Corp. v. Shlensky, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550 (1955) and also reaffirmed in *American Trailer*, supra.

■ In this case, all the debtors require rehabilitation. This will involve the adjustment of their public and their intercorporate debts. The investors in the debtors are numerous and widely scattered and the required adjustments will be major in character. It is obvious to the Court that the unsecured creditors at the time they made their loans were not informed how, nor were they aware of the purposes for which their monies were intended to be used, or to whom they would be required to look for payment beyond the respective makers of the notes which they received. The proposed plan of arrangement still leaves these creditors in the dark respecting the time when, and source from which they may ultimately expect to receive payment in full of their claims. It is therefore essential that a complete investigation be made of the affairs and interrelationships of the debtors by a completely independent trustee upon whose report the court may find a basis for determining whether the adjustment of all interests among the debtors, secured creditors, unsecured creditors and stockholders may be effectuated through a reorganization of the corporate debtors and upon what terms.

In this case, as in *General Stores*, supra, at 465, 76 S.Ct. at 519, it is necessary to determine on the facts of the case whether the formulation of a plan under the control of Richmond, or the formulation of a plan under the direction of a disinterested trustee, as assured by the protective provisions of Chapter X "would better serve 'the public and private interests concerned including those of the debtor.'"

"The appointment of a disinterested trustee * * *, his broad powers of investigation * * *, the role of the trustee in preparing a plan, * * * the duty of the Securities and Exchange Commission to render an advisory report on the plan * * *, the requirement that the plan be 'fair and equitable, and feasible' * * *, the power to include the subsidiaries, * * * [and affiliates] in the reorganization * * *—these are controls which c. X gives to the entire community of interest in the [debtor] compan[ies] being reorganized and which are lacking under c. XI. These controls are essential both where a complicated debt structure must be readjusted and where a sound discretion indicates either that there must be an accounting from the management or that a new management is necessary. Those conditions only illustrate the need for c. X. There may be others equally compelling." General Stores, supra, at p. 467, 76 S.Ct. at p. 519.

■■ Finally the arguments offered on behalf of the debtor corporations that Chapter X is inappropriate because of the time and expense involved or because such a proceeding would be the "kiss of death" for the corporations involved must be rejected here as they were in *American Trailer*, supra. As Justice Goldberg there stated:

"Congress has made the determination that the disinterested protection of the public investor outweighs the self-interest 'needs' of corporate management for so-called 'speed and economy.' * * * Moreover, the requirements of Chapter X are themselves sufficiently flexible so that the District Court can act to keep expenses within proper bounds and insure expedition in the proceedings. * * * Chapters X and XI were not designed to prolong —without good reason and at the expense of the investing public—the corporate life of every debtor suffering from terminal financial ills. * * *" *American Trailer*, supra, 379 U.S. at pp. 617–618, 85 S.Ct. at p. 526.

The motion of S.E.C. for dismissal of the present proceeding unless the petitions of the debtors under Chapter XI be amended to conform the proceedings to Chapter X is granted.

S.E.C. is directed to submit an order in conformity with the views herein expressed.