In re CONTINENTAL INVESTMENT
CORPORATION, Debtor.

Monte J. WALLACE and Neil W. Wallace,
Continental Investment Corporation,
and Creditors' Committee, Appellants,

v.

SECURITIES AND EXCHANGE
COMMISSION, Appellee.

Nos. 78–1204, 78–1205 and 78–1238.

United States Court of Appeals,
First Circuit.

Argued Sept. 13, 1978.

Decided Oct. 27, 1978.

As Amended Oct. 31, 1978.

Charles P. Normandin, Boston, Mass., with whom Richard W. Southgate, H. Reed Witherby, and Ropes & Gray, Boston, Mass., were on brief, for Continental Inv. Corp.

Frederick G. Fisher, Jr., Boston, Mass., with whom Hale & Dorr, Boston, Mass., was on brief, for Creditors Committee.

Arthur F. Mathews, Washington, D.C., with whom Irving Widett, Stephen F. Gordon, Widett, Widett, Slater & Goldman, Boston, Mass., P. C., Michael R. Klein, Alexander F. Wiles, and Wilmer, Cutler & Pickering, Washington, D.C., were on brief, for Monte J. Wallace and Neil W. Wallace, intervenors.

David Ferber, Sol. to the Commission, Washington, D.C., with whom Marvin E. Jacob, Associate Administrator, Jerome Feller, Sp. Counsel, Philip M. Mandel, Sp. Counsel, New York City, and Irving H. Picard, Asst. Gen. Counsel, Washington, D.C., were on brief, for Securities and Exchange Commission.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

The debtor, Continental Investment Corporation (CIC), a committee of its creditors, *see* 11 U.S.C. § 738, and the debtor's principal stockholders have appealed from the decision of the district court granting a motion by the Securities and Exchange Commission (SEC) to transfer proceedings from Chapter XI to Chapter X of the Bankruptcy Act pursuant to 11 U.S.C. § 728.[1] We are required to explore the boundaries of the rule promulgated by *SEC v. American Trailer Rentals Co.*, 379 U.S. 594, 85 S.Ct. 513, 13 L.Ed.2d 510 (1965), and the extent of its exceptions.

CIC is a holding company operating through subsidiaries providing financial services. In 1974 CIC defaulted first on

---

1. Section 328 of the Bankruptcy Act, 11 U.S.C. § 728 reads:

"The judge may, upon application of the Securities and Exchange Commission or any party in interest, and upon such notice to the debtor, to the Securities and Exchange Commission, and to such other persons as the judge may direct, if he finds that the proceedings should have been brought under chapter 10 of this Act, enter an order dismissing the proceedings under this chapter, unless, within such time as the judge shall fix, the petition be amended to comply with the requirement of chapter 10 for the filing of a debtor's petition or a creditor's petition under such chapter, be filed. Upon the filing of such amended petition, or of such creditors' petition . . . such amended petition or creditors' petition shall thereafter . . . be deemed to have been originally filed under such chapter."

obligations to 16 banks holding senior debt and then on interest payments to subordinated public debentureholders. As a consequence, negotiations began among CIC, the banks, a Debentureholders Protective Committee formed by institutions holding about ten per cent of the outstanding debentures, and another institutional holder of 16 per cent of the debentures. These negotiations produced a plan of arrangement agreed to in principle by all parties on July 29, 1975, and filed under Chapter XI on April 30, 1976. *See* 11 U.S.C. § 723. Before filing the plan CIC submitted it to its public stockholders and debentureholders via a combined registration and proxy statement processed by the SEC. About 90 per cent of the stockholders and 82 per cent of the debentureholders approved the plan. The percentage of debentureholders had risen to about 90 by the date of the district court opinion.

As of June 30, 1975, CIC owed the banks about $61,000,000. As part of the agreement, but not contingent upon the Chapter XI proceedings, the banks purchased one of CIC's subsidiaries for $34,000,000, reducing the senior debt to $27,000,000. Under the plan of arrangement, if approved, the banks would receive $20,000,000 in Senior Term Notes and $7,000,000 in Senior Preferred Stock with attached warrants to purchase 600,000 shares of CIC common stock.

CIC owed the approximately 1,600 public investors about $42,000,000 as of May 1, 1975. Under the plan they would receive $3,500,000 of Subordinated Interest-Inclusive Debentures, $22,500,000 of Junior Preferred Stock, and $16,000,000 of Convertible Preferred Stock. The Junior Preferred Stock carries warrants to buy 1,780,000 shares of common stock, and the convertible stock can be converted to 4,000,000 shares. Dividends on the new securities will be paid only if all more senior obligations are satisfied. Unpaid dividends will not accumulate. The holders of the Convertible Preferred Stock will elect a majority of the board of directors of CIC. If all warrants

were exercised and all convertible shares converted, the outstanding common stock would be diluted by about one-third.

The plan's purpose is to greatly reduce CIC's annual debt service obligations. Combined with steps already taken by management to divest CIC of marginal and unprofitable subsidiaries and to reduce costs, the parties hope to return CIC to profitable operation. Indeed CIC has been able to produce positive operating revenue in 1976 and 1977.

On June 18, 1976, six weeks after the Chapter XI petition was filed, the SEC moved the bankruptcy judge to transfer the proceedings from Chapter XI to Chapter X. The bankruptcy judge denied the motion without making explicit reference to *SEC v. American Trailer Rentals Co.*, 379 U.S. 594, 85 S.Ct. 513, 13 L.Ed.2d 510 (1965), and confirmed the plan. The district court reversed, holding that *American Trailer Rentals* required the case to proceed in Chapter X. This appeal is taken from the district court's order.

■ Our starting point for analysis must be *American Trailer Rentals*, wherein Justice Goldberg, speaking for a unanimous Court, explained in great detail the relationship between Chapters X and XI and the factors determining the choice between those chapters in a particular case. Though the decision to transfer is committed to the district court's discretion, *Schreibman v. Mason*, 377 F.2d 99, 102 (1st Cir. 1967); *see* 11 U.S.C. § 728 (note 1, *supra* ), that discretion must be exercised in reliance on the principles stated in *American Trailer Rentals*, 379 U.S. at 619, 85 S.Ct. 513, which reaffirms and explains the decisions in *General Stores Corp. v. Shlensky*, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550 (1956), and *SEC v. United States Realty & Improvement Co.*, 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940).

■■ The Supreme Court's examination of the legislative history [2] of the Bankrupt-

---

2. We rely on the Supreme Court's fuller discussion of the legislative history of the Bankruptcy Act in *SEC v. American Trailer Rentals Co.*, 379 U.S. 594, 603–07, 85 S.Ct. 513, 13 L.Ed.2d 510 (1965).

cy Act revealed that Chapter XI was created "to provide a quick and economical means of facilitating simple compositions among general creditors who have been deemed by Congress to need only the minimal disinterested protection provided by that Chapter." 379 U.S. at 606–07, 85 S.Ct. at 520. The purpose of Chapter X, on the other hand, is "to afford greater protection to creditors and stockholders by providing greater judicial control over the entire proceedings and impartial and expert administrative assistance . . . through appointment of a disinterested trustee and the active participation of the SEC." 379 U.S. at 604, 85 S.Ct. at 519. "The basic assumption of Chapter X . . . is that the investing public dissociated from control or active participation in the management, needs impartial and expert assistance in the ascertainment of facts, in the detection of fraud, and in the understanding of complex financial problems." 310 U.S. at 448–49 n.6, 60 S.Ct. at 1050.

■ On the basis of the above distinctions, Congress drafted the two chapters to meet different ends. "In enacting these two distinct methods of corporate rehabilitations, Congress has made it quite clear that Chapters X and XI are not alternate routes, the choice of which is in the hands of the debtor. Rather, they are legally, mutually exclusive paths to attempted financial rehabilitation." 379 U.S. at 607, 85 S.Ct. at 520. *Compare* 11 U.S.C. § 546(2) *with* 11 U.S.C. § 728. Congress has allocated corporate rehabilitation schemes between Chapters X and XI on the basis of assumptions properly within the legislative domain. The task of the courts is to determine in which chapter a particular scheme belongs.

■ The Supreme Court has rejected the SEC's suggestion that the structure of a corporation or the structure of its public debt automatically determines the appropriate chapter. All corporations with public investors need not submit to Chapter X, 379 U.S. at 607, 85 S.Ct. 513, nor must all cases directly affecting the rights of public inves-

tor creditors of a publicly held debtor proceed in Chapter X, 379 U.S. at 611, 85 S.Ct. 513. The Court has, however, endorsed a general rule that normally Chapter X is "adapted to the reorganization of corporations with complicated debt structures and many stockholders" and Chapter XI is adapted "to composition of debts of small individual businesses and corporations with few stockholders", 379 U.S. at 608, 85 S.Ct. at 521, *quoting United States Realty*, 310 U.S. at 447, 60 S.Ct. 1044, 1049. CIC does have a complicated debt structure and many stockholders. Therefore, it falls within the general rule.

■ The fact that the Court has chosen a general rule rather than an absolute rule means, of course, that there are exceptions. But the exceptions are very narrow, 379 U.S. at 614, 85 S.Ct. 513, and must be related to the unique purposes of Chapter XI. *United States Realty*, which first expressed the general rule, pointed out that "[a] large company with publicly held securities may have as much need for a simple composition of unsecured debts as a smaller company. And there is no reason we can see why c. XI may not serve that end." 350 U.S. at 466, 76 S.Ct. at 519. *American Trailer Rentals* elaborated on the purpose of the exception. " 'Simple' compositions are still to be effected under Chapter XI. Such a situation, even where public debt is directly affected may exist, for example, where the public investors are few in number and familiar with the operations of the debtor, or where, although the public investors are greater in number, the adjustment of their debt is relatively minor, consisting, for example, of a short extension of time for payment." 379 U.S. at 614, 85 S.Ct. at 524. These two situations are given only as examples. The Court has not excluded the possibility that there may be other situations in which the rights of public investor creditors can be adjusted in Chapter XI. We conclude, however, that any such situations would have to fall within the defini-

tion of "simple composition".[3] Neither *American Trailer Rentals* nor *United States Realty* gives any indication that the narrow exception to the general rule can extend beyond simple compositions.

■ Moreover, extending the exception beyond simple compositions would frustrate the legislative assumptions as explained by the Court and set out above. For if a substantial number of public investors are involved in any reorganization the fairness of which is not facially apparent, a decision to allow the matter to proceed in Chapter XI is to substitute a court's faith in the goodwill, fairness, and competence of those representing the debtor and the creditors for the congressionally mandated protections of Chapter X.

■ We are bolstered in this reading of *American Trailer Rentals* by other passages in the opinion. The clearest statement comes in the Court's application of the rule to the facts of that case:

"Here public debts are being adjusted. The investors are many and widespread, not few in number intimately connected with the debtor, and the adjustment is quite major and certainly not minor. *These facts alone would require Chapter X proceedings under the above-stated principles.*" 379 U.S. at 615, 85 S.Ct. at 525 (emphasis added).

The Court's ensuing discussion of facts indicating management wrongdoing and the need for an independent trustee are additional factors not necessary to the holding in that case. Later, in a footnote discussing the scope of discretion accorded the district court, the Court refers to the factual question "whether or not that particular debtor needed a more pervasive reorganization than a simple composition under Chapter XI." 379 U.S. at 619 n.18, 85 S.Ct. at 527. The phrasing of this question indicates that pervasive reorganizations belong in Chapter X. *See* 379 U.S. at 614–15, 85 S.Ct. 513.

■ All parties concede that the reorganization proposed in this case is major, greatly altering the rights of numerous, widespread public investors.[4] Therefore, this corporate rehabilitation, if it is to go forward at all, must proceed in Chapter X. It is the exact kind of case for which Congress intended Chapter X.

■ We do not think our holding or our reasoning is in any way inconsistent with the Supreme Court's repeated statements that the particular "needs to be served" rather than an absolute rule should control the outcome. *See, e. g.,* 379 U.S. at 610, 85 S.Ct. 513; 350 U.S. at 466, 76 S.Ct. 516. One of the factors determining the needs to be served is "the need to readjust a complicated debt structure requiring more than a simple composition of unsecured debt." 379 U.S. at 610, 85 S.Ct. at 522; 350 U.S. at 467, 76 S.Ct. 516. We interpret *American Trailer Rentals* to hold that this one factor requires transfer to Chapter X. Only where it is absent is it possible for a reorganization affecting publicly held debt to go forward in Chapter XI. When the reorganization is not major the court must go on to consider other factors such as whether "there is evidence of management misdeeds for which an accounting might be

---

3. The Supreme Court uses the term "simple composition" as the complement of "major reorganization". We think it clear that "simple composition" includes minor reorganizations directly affecting publicly held debt where the public impact is minimized, for instance, by the small number of public investors or their close ties to the debtor's operations. 379 U.S. at 614, 85 S.Ct. 513.

4. Under the plan of arrangement, the debtor would have eight layers of securities. The banks would hold $20,000,000 of Senior Term Notes, $7,000,000 of Senior Preferred Stock, and warrants attached to the preferred stock to purchase 600,000 shares of common stock. The public debentureholders would have $3,500,000 of Subordinated Interest-Inclusive Debentures, $22,500,000 of Junior Preferred Stock, warrants attached to the preferred stock to buy 1,780,000 shares of common stock, and $16,000,000 of Convertible Preferred Stock. The holders of the existing 13,000,000 shares of common stock would retain those shares. All of the various layers above the common stock would be newly created. Currently CIC's capital structure is relatively simple, consisting of two issues of subordinated debentures, one due in 1985 and the other in 1990, as well as the common stock and the bank debt.

made, . . . a need for new management, or the financial condition of the debtor requires more than a simple composition of its unsecured debts." 379 U.S. at 615, 85 S.Ct. at 524. These factors must then be weighed to determine whether Chapter X or Chapter XI best serves the particular needs of a debtor and its public investors.

 To sum up, we think the Supreme Court has established a two-step test to determine whether a corporate rehabilitation affecting publicly held debt can go forward in Chapter XI or must be transferred to Chapter X. First, looking at the plan of arrangement the court must decide whether the plan proposes a major reorganization or a simple composition. Only the latter is eligible for Chapter XI treatment. Relatively minor adjustments of publicly held debt may be simple compositions. *See* 379 U.S. 614, 85 S.Ct. 513; note 4, *supra.* Second, if the proposed plan gets by the first test—if it does not outline a major reorganization—then the court must go beyond the face of the plan to examine such factors as "requirements of fairness to public debt holders, need for a trustee's evaluation of an accounting from management or determination that new management is necessary, and the need to readjust a complicated debt structure requiring more than a simple composition of unsecured debt." 379 U.S. at 610, 85 S.Ct. at 522; 350 U.S. at 466–67, 76 S.Ct. 516.[5] There need not be a detailed weighing of factors where the plan proposes a major reorganization. Conversely a proposed simple composition cannot escape careful factual analysis.

Appellants argue with some force that in many ways this reorganization, though major, is appropriate for Chapter XI. They suggest that many of the safeguards provided by Chapter X have been taken care of or are not needed in this case. The creditors, on their own behalf, have investigated the debtor, and the bankruptcy judge found "that there is insufficient evidence in the record to warrant a finding that a further investigation of the affairs of the debtor by an independent trustee would be either useful or productive." Some doubt is cast on the adequacy of the investigation both by the fact that its results do not appear in the record and by the district court's finding that "there is need of an independent investigation into the pending lawsuits against CIC to establish whether there is likelihood that present management would continue to operate for the best interests of the public investors."[6] It is clear, however, that this is not the case contemplated by Congress where the creditors were forced to proceed without getting questions answered or solely on the basis of management representations.

Moreover, the parties to this negotiation were all sophisticated. The debentureholders' representatives were institutions with significant holdings capable of understanding the financial complexities and protecting their own interests. Though not intimately connected with the debtor, these were not the widespread public investors unable to band together or hire representatives to protect themselves and unable to understand their predicament whom Congress intended to protect. *See* 310 U.S. at

---

**5.** The last factor listed is not simply a restating of the first step test. Rather it requires a court to consider whether a plan proposing a simple composition will adequately rehabilitate the corporation, or whether a more pervasive plan will ultimately be necessary.

**6.** The Federal Rules of Bankruptcy, Rule 810, extend the clearly erroneous rule to bankruptcy proceedings. "The court shall accept the referee's findings of fact unless they are clearly erroneous, and shall give due regard to the opportunity of the referee to judge of the credibility of the witnesses." Our holding, of course, does not turn on whether or not we

accept the district judge's finding. In any event, in this instance, we see no conflict between the finding of the bankruptcy judge and the district court. The bankruptcy judge spoke only of "the affairs of the debtor" and rejected the need for further investigation for lack of evidence. He did not mention the pending litigation against the debtor. Strictly speaking, this litigation may not be one of "the affairs of the debtor." But even if it were, the district judge was entitled to consider it important and arrive at the "firm conviction that a mistake ha[d] been committed." *Id.,* Editorial Comment, § 810.1.

448–49 n.6, 60 S.Ct. 1044. The parties to the negotiation were dealing at arm's length. None of them represented more than one class of creditor or security holder. About ninety percent of CIC's shareholders and of the debentureholders [7] as well as every one of the banks holding senior debt have approved the plan.

The bankruptcy judge found that the plan so negotiated "is *feasible* and in the *best interests* of the creditors" (emphasis in original). All parties make significant sacrifices under the plan although no finding has been made that it is "fair and equitable" as would be required under Chapter X. 11 U.S.C. § 621(2). Unlike the situation in *American Trailer Rentals*, management of the debtor here has not clearly been guilty of extensive misappropriation, self-dealing, or securities fraud. Present management has already divested CIC of many marginal and unprofitable subsidiaries and operated profitably in 1976 and 1977. The bankruptcy judge found "no evidence of wrongdoing on the part of the management of the debtor. There is insufficient evidence in the record to warrant a finding that new management of the debtor is needed." [8]

 None of these factors, however, allow us to ignore Congress' division of corporate rehabilitations between Chapters X and XI. At best, the facts of this case suggest that some of the assumptions Congress made may be outmoded and have been overtaken by changing patterns of public investment. Perhaps the Bankruptcy Act now cuts too broadly in assuming that all public investors of corporations need SEC protection in order to make and safeguard their investment decisions. If so, though, Congress is the appropriate body to consider amending the law. A court cannot make an exception to a statutory rule on the basis of that court's determination that Congress established the rule on the basis of a faulty set of assumptions. And this court is bound by the Supreme Court's determinations of legislative history and purpose.

We would add one consideration of a more positive nature. The present litmus test, at least as we have interpreted the law, for determining whether the threshold requirement for Chapter XI has been met, i. e., whether nothing more than a simple composition affecting public investors is contemplated, has the merit of simplicity. To the extent that complex arrangements be permitted to qualify for Chapter XI treatment, if widely approved, if deemed eminently feasible, if found "fair" to public investors, if the public investors are found to be fully informed, etc., judgment calls may vary and litigation is invited. Decisions ought not to turn on "the 'particular experience and predilections' of the district judge involved." 379 U.S. at 620, 85 S.Ct. at 527; *quoting SEC v. Canandaigua Enterprises Corp.,* 339 F.2d 14, 19 (2d Cir. 1964).

Our decision is not irreconcilable with other courts' resolutions of the issue. The Second Circuit recently allowed a publicly owned corporation to proceed under Chapter XI with a plan for rehabilitation that directly affected publicly held debt. *In the Matter of Alrac Corp.,* 550 F.2d 1314 (2d Cir. 1977). The Second Circuit's analysis was somewhat different from ours in that it considered the extent of the reorganization as only one factor to weigh against others— particularly the likelihood that the debtor might not survive Chapter X proceedings, *see infra,* the fact that the debt holders had overwhelmingly approved the plan, and the

---

7. The Second Circuit has said that "[w]hen confronted with a Chapter XI arrangement that is overwhelmingly approved by the holders of the debtor's public debt, as in this case, the courts are usually reluctant to order conversion to Chapter X." *In the Matter of Alrac Corp.,* 550 F.2d 1314, 1319 (2d Cir. 1977). But this reluctance cannot override the principles of *American Trailer Rentals. See Norman Finance and Thrift Corp. v. SEC,* 415 F.2d 1199, 1202 (10th Cir. 1969).

8. The district court questioned this finding because it interpreted the facet of the plan giving the power of electing a majority of the board of directors to the debentureholders as indicating lack of confidence in the existing management. Giving the public investors veto power falls far short of finding that new management is needed. On this basis alone we could not reject the finding of the bankruptcy judge. *See* note 5, *supra.*

fact that the SEC had not chosen to intervene. But it did conclude that in comparison to those factors the adjustment of the publicly held debt was insubstantial. Indeed, that plan called for full cash payment of that debt. "[T]he adjustment affected only the timing of the payments and the note holders' right to interest after August 20, 1974." *Id.* at 1319. Such an "adjustment of their debt is relatively minor" and may, therefore, qualify as a "simple composition" under *American Trailer Rentals,* 379 U.S. at 614, 85 S.Ct. at 524, thus justifying the more probing second stage weighing process. Clearly the reorganization in our case, completely rearranging the relationship between the debtor and its creditors and introducing complicated new layers of securities, is far more pervasive than that in *Alrac.*

Similarly *In re KDI Corp.,* 477 F.2d 726 (6th Cir. 1973), is distinguishable. There the Sixth Circuit affirmed a denial of a motion to transfer the readjustment of debt of a public corporation from Chapter XI to Chapter X. The court acknowledged the Supreme Court's insistence that major reorganizations of public debt proceed in Chapter X, *id.* at 736, but found that KDI had no publicly held debt. Therefore it was appropriate for it to examine other factors to determine whether Chapter X might be required anyway. *Cf. Posi-Seal International, Inc. v. Chipperfield,* 457 F.2d 237 (2d Cir. 1972) (allowing Chapter XI where no prejudice to public investors and no public debentureholders); *Norman Finance and Thrift Corp. v. SEC,* 415 F.2d 1199 (10th Cir. 1969) (transferring to Chapter X where "drastic readjustment" of rights of public creditors); *In re Peoples Loan & Investment Co. of Fort Smith,* 410 F.2d 851 (8th Cir. 1969) (transferring to Chapter X where adjustment not minor); *Manufacturers Credit Corp. v. SEC,* 395 F.2d 833 (3d Cir. 1968) (transferring to Chapter X where radical readjustment of debt structure); *SEC v. Canandaigua Enterprises Corp.,* 339 F.2d 14, 21 (2d Cir. 1964) (requiring transfer to Chapter X when publicly held debt subjected to substantial adjustment departing from "fair and equitable" rule); *In re Meis-*

*ter Brau,* 355 F.Supp. 515 (N.D.Ill., 1972) (requiring transfer to Chapter X whenever complicated debt structure requires pervasive reorganization).

Appellants also pursue a distinct line of argument. They raise the possibility that the added delay, expense, and uncertainty inherent in transferring the case to Chapter X at this point might doom the corporation to liquidation or at least needlessly weaken its recovery. Such considerations may not be legitimate ones. *SEC v. Burton,* 342 F.2d 783, 785 (1st Cir. 1965), *but see In the Matter of Alrac, supra,* 550 F.2d at 1319. Chapter X's very purpose is to insure an exhaustive investigation and careful consideration of the interests of public investors. The essential question is whether such extra protection is required. It would be circular to find Chapter X were required but should not be resorted to because it would be too costly. It is natural for a debtor to prefer Chapter XI's speed and economy, but the Supreme Court took care in *American Trailer Rentals* to dispose of the argument:

"In this area, as with other statutes designed to protect the investing public, Congress has made the determination that the disinterested protection of the public investor outweighs the self-interest 'needs' of corporate management for so-called 'speed and economy.' In fact, experience in this area has confirmed the view of Congress that the thoroughness and disinterestedness assured by Chapter X not only result in greater protection for the investing public, but often in greater ultimate savings for all interests, public and private, than do the so-called 'speed and economy' of Chapter XI. . . . Moreover, the requirements of Chapter X are themselves sufficiently flexible so that the District Court can act to keep expenses within proper bounds and insure expedition in the proceedings. We also reject respondent's further argument that the time and expense of a Chapter X proceeding would be so great that the ultimate result might be straight bankruptcy liquidation . . . .. In addition to the above answers to respondent's gen-

eral-time-and-expense argument, we feel compelled to point out, without indicating any opinion as to the ultimate outcome of the attempted financial rehabilitation in this case, that it must be recognized that Chapters X and XI were not designed to prolong—without good reason and at the expense of the investing public—the corporate life of every debtor suffering from terminal financial ills." 379 U.S. at 617–18, 85 S.Ct. at 526 (footnotes and citations omitted).

Even if the arguments were legitimate, we could not assume that dire consequences must result. As the Court noted, Chapter X is flexible. If adequate investigations have in fact been carried out, the trustee ought to be able to compress his investigation accordingly. If the plan worked out is indeed the best one for all parties concerned, it is likely the trustee can utilize substantial parts of it. If the groundwork has all been laid, implementation of the final plan could be expedited. The bankruptcy judge noted that there is some uncertainty whether CIC would be able to take advantage of a $28,000,000 loss carry forward were the proceedings to be transferred to Chapter X. The outcome turns on congressional action, however, and we must assume that Congress has in mind the effect its tax laws have on its bankruptcy laws. We must assume that the result of the Chapter X proceedings will be the result intended by the law as administered to the best of all parties' abilities. Finally, we note that if delay does result, that delay is ultimately chargeable to the debtor for having failed to read *American Trailer Rentals* literally. The choice between Chapters X and XI is not left to the debtor, 379 U.S. at 607, 85 S.Ct. 513, and the Court stated in no uncertain terms that major reorganizations of publicly held debt where the investors are many and widespread must proceed in Chapter X. 379 U.S. at 615, 85 S.Ct. 513.

*Affirmed.*