**In the Matter of NORMAN FINANCE AND THRIFT CORPORA-TION, Debtor,**

v.

**SECURITIES AND EXCHANGE COM-MISSION, Appellant.**

No. 195–68.

United States Court of Appeals Tenth Circuit.

Sept. 16, 1969.

See also, D.C., 298 F.Supp. 336.

Paul Gonson, Asst. Gen. Counsel (Philip A. Loomis, Jr., Gen. Counsel, David Ferber, Sol., Frank N. Fleischer, Atty., J. Kirk Windle, Special Counsel, and Joel A. Haber, Atty., Chicago Regional Office, Chicago, Ill., with him on the brief), for appellant.

Keith McMillin, Oklahoma City, Okl., and William H. Erickson, Denver, Colo. (Mather M. Eakes, Oklahoma City, Okl., with them on the brief), for debtor.

Before PHILLIPS, SETH, and HICKEY, Circuit Judges.

SETH, Circuit Judge.

This appeal comes to us from an order of the District Court denying a motion of the Securities and Exchange Commission made pursuant to section 328 of the Bankruptcy Act to dismiss the instant proceeding under Chapter XI of the Bankruptcy Act and in effect to transfer the proceedings to Chapter X.

The debtor-appellee is a holding company engaged in the consumer loan business. It finances its operations by selling to investors certificates of deposit called "Thrift Savings Accounts," which are unsecured obligations of the corporation. These bear interest at rates between five and six per cent per annum with the principal payable upon demand. As of March 31, 1968, there were $1,290,727.00 in these accounts outstanding and held by more than six hundred investors, most of whom lived in the vicinity of Norman, Oklahoma.

In June 1965 the debtor filed an offering circular with the Oklahoma Securities Commission for the authorization of further thrift account deposits. The State Commission investigated the debtor's activities and found that a substantial amount of the funds obtained from the public had been used for the personal investment purposes of the debtor's president and controlling shareholder, C. Ralph White. Subsequent to this investigation, White voluntarily ceased offering the thrift accounts. A financial statement of the debtor of June 30, 1967, submitted to the State Commission, disclosed that White and his companies owed approximately $410,000.00 to the debtor; however, on March 31, 1968, that statement showed a reduction in this liability to about $84,000.00. White accomplished this reduction of the debt by transferring some capital stock of his companies and by forfeiting collateral pledged to the debtor. There is no indication of the actual value of the assets transferred to the debtor.

In May 1968 the State Commission sought to enjoin White and his companies from violating the Oklahoma Securities Act and for the appointment of a conservator for the defendants and their assets. The Commission alleged that the funds paid by public investors in to the debtor had been used by White and his corporations without disclosure to the public, and that such unauthorized use on his part contributed partly to the debtor's operating deficit of more than $400,000.00, which impaired the debtor's financial condition. The state court thereupon issued a temporary restraining order and enjoined the disposition of the assets of the corporation and set a hearing for the application for the temporary injunction for June 20, 1968. However the debtor filed its Chapter XI petition on June 11, and on June 17 the Referee in Bankruptcy issued an order staying the state court proceedings.

A Mr. Donald Childress and the Triton Insurance Company now control the stock of the debtor, and have been instrumental in proposing the reorganization plans under Chapter XI of the Bankruptcy Act.

The manner in which Triton became involved with the debtor is that its president, Mr. Donald Childress, became acquainted with Mr. White in 1967. Mr. White, then president of the debtor, explained to Mr. Childress that the debtor

was short of working capital; that another corporation he wholly owned, the Norman Mortgage and Investment Company, in turn owned a subsidiary, National Fidelity Insurance Company. Fidelity had insured each of the thrift accounts in the debtor up to $15,000.00 with total liability limited to $1,500,-000.00. Fidelity had $150,000.00 in cash. White could not use this cash because of legal reserve requirements and he suggested to Childress that if Triton would buy Fidelity using Triton stock for the purchase price, Triton then could invest the $150,000.00 in the debtor in order to provide the needed working capital. The two men then would be able to develop the consumer finance business throughout rural Oklahoma. Mr. Childress agreed and Triton merged with Fidelity, and Triton then itself insured each of the debtor's thrift accounts up to $15,000.00, put the $150,-000.00 received from Fidelity into the debtor, and received $125,000.00 in preferred stock and $25,000.00 in mortgage loans.

Childress testified that he had no knowledge of the financial condition of Fidelity or of the debtor until after the merger. In February 1968 when Childress learned of the difficult financial condition of the debtor, he obtained for Triton a trust agreement from White whereby Childress was given as trustee a two-year irrevocable proxy on all the stock of the debtor. The stated purpose of the agreement was to reorganize the debtor by appointment of a new board.

In May 1968 Childress exercised the trust provisions and voted out of office White and the directors serving with him, and elected new directors including himself. One of the new board's first acts was to file this Chapter XI proceeding. White refused to relinquish control of the company and to surrender his books and records. Childress then moved for a turnover order and White resisted, claiming fraud, duress, and deceit on the part of Childress in obtaining the trust agreement and misrepresentations on the part of Triton.

White also objected to the Chapter XI petition. Prior to the hearing on the motion, however, White withdrew all his objections, stating that his reason for doing so was that he could no longer obtain the funds necessary to aid the debtor and that he understood that Triton could.

Thereafter Triton then conducted audits and appraisals on the debtor, and upon their completion filed the proposed arrangement on December 2, 1968, offering the thrift account holders an option to elect between two alternatives: (1) Payment of each claim in the proportion of forty per cent in new debentures and sixty per cent in new common stock of the debtor-appellee; or (2) payment of each claim by debentures in the amount of seventy per cent of the claim. The debentures were to be convertible into common stock of the debtor at $1.00 per share or to be callable at any time before conversion and were to be guaranteed by Triton Corporation, the parent of Triton Insurance Company. Under the first alternative, the debentures were to bear interest at six per cent payable over a period of five years and ninety days. The debentures issued under the second alternative would be without interest for five years and ninety days, and then would bear interest at six per cent thereafter payable over a period of seven years and ninety days. Triton Corporation would invest $125,000.00 in the debtor, represented by debentures which were to be subordinate to all debentures issued under the plan.

If the thrift account holders accepted the plan, it would be in complete settlement and satisfaction of all their claims against Triton Insurance Company, i. e., they would relinquish all claims on the insurance of the accounts. Triton Insurance Company had insured each of the debtor's thrift savings accounts up to $15,000.00 (of the six hundred investor-creditors, only six have invested $15,-000.00 or more). However, shortly before the debtor filed its Chapter XI proceeding, Triton cancelled its policy

on the accounts, alleging it had been fraudulently induced to insure them. The depositors' possible claims arose from these circumstances. In soliciting acceptance of the plan, Triton represented that the investor-creditors would either have to accept the proposed plan with its alternatives or be faced with litigation and liquidation. Triton by now has obtained acceptance by the requisite number and dollar volume of the unsecured creditors.

The Securities and Exchange Commission in its motion to terminate the Chapter XI proceedings and require that Chapter X be used instead asserts that rehabilitation of the debtor-appellee, Norman Finance and Thrift Corporation, should not be allowed to proceed under Chapter XI inasmuch as Chapter XI would not provide proper protection for the interests of the investor-creditors of debtor in light of the nature and extent of the debtor's financial difficulties and the asserted conflicts of interests which would be involved in any proposed reorganization. The Commission also urges that the evidence of past management misdeeds requires the appointment and investigation of an independent trustee which only Chapter X provides.

The debtor urges that the use of Chapter XI is proper as found by the trial court in order to avoid the delay of a Chapter X proceeding, to avoid liquidation which it asserts would follow under Chapter X, and the proposed plan contains the only prospect for additional funds. The debtor asserts that there is already new management with the ousting of the White group.

We feel compelled, in view of the holdings of the Supreme Court in Securities & Exchange Comm'n v. American Trailer Rentals Co., 379 U.S. 594, 85 S.Ct. 513, 13 L.Ed.2d 510, and the cases on which it is based, to reverse the trial court and to direct that the Chapter XI proceedings be dismissed unless within the time set by the trial judge the petition be amended and refiled to comply with the requirements of Chapter X of the Bankruptcy Act for the filing of a debtor's petition or creditor's petition under such Chapter, all as contemplated by section 328 of the Bankruptcy Act, 11 U.S.C. § 728.

 As indicated above the requisite consents have been received to the plan proposed by the management of the debtor. This is a majority of the investors in number and claims whose money is at stake, but in view of the manner in which plans are proposed, and by whom they are proposed under Chapter XI, this consent is a factor to be considered, but is by no means determinative. Securities & Exchange Comm'n v. Peoples Loan & Investment Co., 410 F.2d 851 (Eighth Circuit, April 23, 1969). Further from the record it appears that here the consent to the plan of reorganization was solicited by management on the statutory take or leave basis and also with the additional suggestion that the alternative to the plan was litigation and liquidation. Thus, although the courts are reluctant to interfere in these situations where some sort of consent has been obtained, they must do so when the circumstances bring the case within the holdings of Securities & Exchange Comm'n v. American Trailer Rentals Co., 379 U.S. 594, 85 S.Ct. 513, 13 L.Ed.2d 510, and its predecessors. See also In re Colorado Trust Deed Funds, Inc., 311 F.2d 288 (10th Cir.). Thus it is apparent that the courts must start with the proposition that Chapter X is, as a general rule, the appropriate device for the adjustment of publicly held debt. It is likewise apparent that Chapter X is not required to be used in all cases where the rights of public investor-creditors are involved. The Securities and Exchange Commission was clearly rebuffed in American Trailer Rentals in its attempt to establish the proposition that Chapter X must always be used where the rights of the public investor-creditors are to be altered.

The Court in American Trailer Rentals describes in detail the history of Chapters X and XI, and the needs to be served by each. The Court emphasizes

that the two are not alternative routes to be chosen by the debtor but are two distinct and mutually exclusive methods for corporate rehabilitation.

It would serve no purpose to review here or repeat the holdings and analysis of the Court in American Trailer Rentals. Instead we will do no more than show their application to the case before us. The decision is a complete answer to the debtor's contentions. As the Court points out, and referring to General Stores Corp. v. Shlensky, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550, and to Securities & Exchange Comm'n v. United States Realty & Improvement Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293, Chapter XI is designed for relatively simple compositions concerning trade creditors. Thus Chapter XI contemplates a proposal coming from management for a variation in terms and amounts, submitted to creditors who are presumably experienced in trade credit problems met by their customers. On the other hand Chapter X is designed for situations where the creditors are at least in part of a somewhat different nature, presumably less sophisticated as far as their knowledge of finance and of the debtor's problems is concerned, and where the needed adjustments appear to be substantial. Under Chapter X the proposals come after a disinterested investigation has been made, and come from disinterested sources rather than from management, old or new.

In the case before us the number of investor-creditors is not large as compared to the number in the American Trailer Rentals case, nor to the number of shareholders in General Stores Corp. v. Shlensky, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550, or in Securities & Exchange Comm'n v. United States Realty & Improvement Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293. The creditors here also live in a small geographic area; however, the nature of their investment must be regarded as a significant factor in reaching the conclusion that Chapter X is required. The creditors here cannot be compared to trade creditors; instead they are a group of persons who made an investment in "Thrift Saving Accounts," a type of deposit with the debt payable on demand and drawing interest. These "depositors" did not invest to participate in the debtor's business ventures as a stockholder would, and, of course the account did not arise from the sale of goods to the debtor.

The apparent needed adjustments in the rights of these investors are substantial, and by no means represent a minor variation in the terms of the debts. Under the proposed plans the most they could expect to receive would be seventy per cent of their deposits to be paid over or at the end of a long period of time. An alternative is an exchange of part of their claims for stock. Either of these represent a drastic adjustment of their rights if these represent the extent of needed change.

It should also be noted that under the plans proposed by the debtor either White or Childress or both could possibly retain control of the corporation, dependent upon the selections made by creditors. The Court in the American Trailer Rentals case commented " * * 'that in any plan of corporate reorganization unsecured creditors are entitled to priority over stockholders to the full extent of their debts and that any scaling down of the claims of creditors without some fair compensating advantage to them which is prior to the rights of stockholders is inadmissible.'"

The debtor argues that the only apparent source of additional funds for the debtor will come only under the plan it proposes and only from Triton Corporation, the parent corporation of Triton Insurance Company. This may very well be but the other factors must be weighed. Also under the proposal for this money, Triton would receive a noninterest bearing debenture payable in ten years in that amount. While this debenture would be subordinate to the new debentures to be issued to the holders of thrift accounts, it would have preference over the stock the debtors may receive for the balance of their

claims. See Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982.

In view of the apparent prior mismanagement of the debtor and possible claims against prior officers, it is apparent that some independent investigation of the corporation's financial affairs is required. This disinterested evaluation can only be accomplished under Chapter X. To be sure there has been elected a new board and new officers for the debtor, and the debtor argues that this is sufficient "new management." However, this does not here accomplish the desired result in view of the prior business relationships between White and Triton, and in view of White's charge of fraud against Triton although later abandoned. This new management is not the equivalent of the investigation a trustee would make and the trial judge's evaluation.

One of the significant factors which requires the result we here reach is the problem arising from the insurance covering the amounts the investor-creditors had invested with the debtor. As indicated above, this insurance for the investors' benefit was provided by a corporation controlled by White which was merged with Triton so the funds of the controlled corporation would be freed for use of the debtor. After the merger Triton instead wrote the insurance. This coverage was later cancelled by Triton when it was realized that the debtor was in trouble. This cancellation is an important factor in the debtor's financial picture, and a significant element, although now somewhat nebulous, in the investor-creditors' evaluation of their position. However, the debtor is now dominated by this insurance company which cancelled the coverage, and it becomes difficult to see how this company, and its officers, can avoid being placed in an inconsistent position as the matter progresses. Also, as mentioned above, the plan the debtor proposed provides that the investors' or debtor's insurance claims against Triton are waived if the plan is accepted. Thus to management the claim apparently is still a real factor in the reorganization. The insurance cancellation is the subject of state court proceedings, but it is not known whether this is the answer for the problems facing the investors. Thus again the need for an independent investigation and disinterested evaluation and assertion of claims is indicated. Audits which have here been made are clearly inadequate for these purposes.

■ The debtor also makes the argument that time is of the essence if the debtor is to be saved; that Chapter XI can provide a more speedy and economical method of rehabilitating the debtor. Time is always a factor under the Bankruptcy Act and this litigation has taken time, but as pointed out in Securities & Exchange Comm'n v. American Trailer Rentals, supra:

" * * * [T]he requirements of Chapter X are themselves sufficiently flexible so that the District Court can act to keep expenses within proper bounds and insure expedition in the proceedings. We also reject respondent's further argument that the time and expense of a Chapter X proceeding would be so great that the ultimate result might be straight bankruptcy liquidation, which, respondent contends, 'would mean probable total loss for [the] trailer owners.' In addition to the above answers to respondent's general-time-and-expense argument, we feel compelled to point out, without indicating any opinion as to the ultimate outcome of the attempted financial rehabilitation in this case, that it must be recognized that Chapters X and XI were not designed to prolong—without good reason and at the expense of the investing public —the corporate life of every debtor suffering from terminal financial ills."

Reversed and remanded for further proceedings as contemplated by section 328 of the Bankruptcy Act, 11 U.S.C. § 728.