In the Matter of KDI CORPORATION, Debtor.

Frederick BEACH and Vincent Di Rubbio, Appellants,

v.

KDI CORPORATION and KDI Creditors' Committee, Appellees.

No. 72–1485.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 28, 1972.

Decided April 10, 1973.

See also 6 Cir., 477 F.2d 742.

J. Vincent Aug, Nieman, Aug, Elder & Jacobs, Cincinnati, Ohio, on brief for appellants, Frederick Beach and Vincent Di Rubbio; Converse Murdoch, Peter J. Walsh, Wilmington, Del., of counsel.

Mark S. Lieberman, Chicago, Ill., and John A. Benjamin, Cincinnati, Ohio, for appellee, KDI Corp.; Gottlieb & Schwartz, Chicago, Ill., and Robert O. Edington, Cors, Hair & Hartsock, Cincinnati, Ohio, on brief.

John A. Benjamin, Benjamin, Faulkner & Tepe, Cincinnati, Ohio, on brief for KDI Creditors Committee.

Before MILLER, KENT and LIVELY, Circuit Judges.

LIVELY, Circuit Judge.

This appeal is from an order of the District Court denying a motion pursuant to § 328[1] of the Bankruptcy Act to dismiss proceedings brought under Chapter XI of the Bankruptcy Act and in effect to transfer them to Chapter X.

Chapter XI of the Bankruptcy Act deals with Arrangements whereas Chapter X deals with Corporate Reorganizations. Section 306 of the Act, 11 U.S.C. § 706(1) contains the following definition:

"'arrangement' shall mean any plan of a debtor for the settlement, satisfaction, or extension of the time of payment of his unsecured debts, upon any terms."

The debtor is KDI Corporation, a publicly owned holding company created under the laws of Delaware with its headquarters in Cincinnati, Ohio. In the three years immediately prior to its public disclosure of financial problems, KDI had acquired 69 wholly-owned subsidiaries involving more than 50 operating businesses in the United States, Canada and England. It is a widely diversified conglomerate, although the parent company is not engaged in any business itself and its only assets are stock in its subsidiaries and cash. KDI furnishes management services to its subsidiaries and is paid fees which, along with the profits of the wholly-owned subsidiaries, supply its operating funds. For the year ended December 31, 1969, KDI reported net sales of nearly $140,000,000.-00 and earnings of approximately 5.3 million dollars. Nevertheless, by August of 1970 the corporation was without funds to meet its current obligations.

At this point a management consulting firm was retained by the corporation and an immediate analysis of its financial position was undertaken. The consultant found that KDI owed about $31,000,000.00 to banks, $9,000,000.00 to its debenture holders and $25,000,000.00 to other creditors. It was estimated that the cash needs for the following six months would be $5,000,000.00 in excess of receipts. The consultant, after analysis, classified the subsidiaries and affiliates into four different groups. Those which were classified as "established companies" were operating profitably and required little financial support from KDI. The next category of "developing companies" were projected for losses in the near future and would continue to require sizable contributions of working capital from the holding company. The third classification was "foreign subsidiaries" which were estimated to have reasonable prospects of producing modest profits in the near future. The fourth category included those affiliated companies in which KDI owned a minority interest and had options to buy control. All of these were unprofitable and appeared to require steady infusions of working capital.

In September, 1970, the directors of KDI adopted a group of specific proposals made by the consultant which included immediate termination of all acquisitions and other commitments which would require cash outlays, immediate end to the flow of cash to developing

---

1. Section 328 of the Bankruptcy Act (11 U.S.C. § 728) reads as follows:

"The judge may, upon application of the Securities and Exchange Commission or any party in interest, and upon such notice to the debtor, to the Securities and Exchange Commission, and to such other persons as the judge may direct, if he finds that the proceedings should have been brought under chapter 10 of this title, enter an order dismissing the proceedings under this chapter, unless, within such time as the judge shall fix, the petition be amended to comply with the requirement of chapter 10 of this title for the filing of a debtor's petition or a creditors' petition under such chapter, be filed. Upon the filing of such amended petition, or of such creditors' petition, and the payment of such additional fees as may be required to comply with section 532 of this title, such amended petition or creditors' petition shall thereafter, for all purposes of chapter 10 of this title, be deemed to have been originally filed under such chapter."

companies and affiliated companies and a reduction in corporate staff and overhead. In the next few months 26 subsidiaries were either sold or closed and there was a complete reorganization of the top management of KDI. The two chief officers during the period of rapid expansion were removed from office and subsequently they resigned as directors. Louis W. Matthey, who had prepared the report and recommendations for the consulting firm, was elected president and chief executive officer of KDI. A new board of directors consisted of Matthey and the presidents of seven of the retained subsidiaries. After approximately one year only fourteen of the top forty-two staff and operating personnel remained on the payroll of KDI and its subsidiaries.

In addition to stopping the outflow of cash, one of the most pressing problems which faced the new management was the fact that over $31,000,000.00 was owed to a consortium of eleven banks on a demand basis and that an interest payment to one of the banks had been missed on August 1, 1970. That bank would not agree to any refinancing unless all of the bank lenders were involved. In order to meet its immediate needs KDI borrowed an additional $1,125,000.00 from the banks and on September 1, 1970, agreed to pledge all stock owned by it in its subsidiaries and affiliates and all notes from subsidiaries and affiliates, not only as security for the new money but to secure the total bank debt which now was $32,425,000.00 plus accrued interest. The maturity date of the entire bank debt was then extended to March 15, 1971.

The second largest item of debt was $9,200,000.00 of convertible debentures held by one or more insurance companies, which agreed to a change in restrictions so that the creation of the secured positions of the banks could not result in a default in the debentures.

Financial statements and earnings estimates which had been issued by the company in mid 1970 were found to be seriously in error. The directors announced publicly that the previously issued statements were not correct and new estimates of operations for the year 1970 were made. The new management of KDI caused a thorough audit to be made by independent certified public accountants and as a consequence substantial operating losses were reported for 1970. The final figures for that year showed operating losses in excess of $9,000,000.00 from continuing operations and in excess of $8,000,000.00 from discontinued operations. In addition to these operating losses there were extraordinary losses of over $19,000,000.-00, including the write-off of good will in consolidated subsidiaries and certain reserves which were deemed to be worthless. The publication of these figures caused a precipitous drop in the price of KDI stock and triggered nine law suits by stockholders and former stockholders who had sold various subsidiaries to KDI during 1969 and 1970. These suits sought rescission of the agreements by which these subsidiaries were acquired and in some cases substantial damages were demanded in addition. Frederick Beach and Vincent Di Rubbio, the appellants in this action, were among those who filed rescission suits.

On December 30, 1970, KDI filed its petition under Chapter XI of the Bankruptcy Act and the proposed plan of arrangement which is annexed to this opinion as an Appendix was submitted on April 6, 1971. On February 10, 1971, a creditors' committee had been elected at the first meeting of creditors and it had employed an attorney and a certified public accountant. On April 14, 1971, the creditors' committee issued a report to the general creditors of KDI Corporation in which it reviewed the events of the recent past which had brought KDI Corporation to the bankruptcy court and analyzed the plan of arrangement which had been proposed. The report strongly endorsed the plan of arrangement and urged all unsecured creditors to file consents to the plan immediately. In addition to discussing the

plan itself, the report disclosed the transactions between KDI and the bank consortium which had resulted in the banks' acquiring security for their preexisting debts. While this transaction was described as being "vulnerable," under section 70(e) of the Bankruptcy Act (11 U.S.C. § 110(e)), nevertheless, the creditors' committee felt that it was not in the best interests of the unsecured creditors to attack it. The committee also reported that it had negotiated with the banks and had been successful in converting $7,000,000.00 of the bank debt to a category equal to that of general creditors and obtaining $3,000,000.-00 from the banks for operating funds for the corporation on certificates of indebtedness, one-half of which was to be available immediately after the plan was approved. On July 29, 1971, Beach and Di Rubbio filed a motion to dismiss the proceedings under Chapter XI unless the petition should be amended for proceedings under Chapter X. The reason given was that the circumstances and capital structure of the debtor were such that the relief afforded by Chapter XI is inadequate to satisfy the needs to be served and, therefore, the petition should originally have been brought under Chapter X.

The hearing on the application to confirm the arrangement was held before the referee in bankruptcy on October 29, 1971. Proof was submitted at that time that a majority in number and in amount in each class of creditors under the division of creditors set forth in the arrangement had approved the plan and filed written consents.[2] Mr. Matthey was then called as a witness in support of confirmation of the plan of arrangement and stated that operations in the first nine months of 1971 had generally been in line with predictions at the time the petition for arrangement was filed on December 30, 1970. He stated that the corporation would show a profit for the year 1971, though it would be less than projected, and that all nonrecurring

losses had now been absorbed and that virtually all unprofitable units had been disposed of. He then described the capital structure of KDI as of the time of the hearing and compared it with the capital structure which would exist if the plan were confirmed.

Matthey stated that prior to confirmation there were seven million shares of common stock outstanding and that this would remain unchanged after confirmation. There were $35,000,000.00 of obligations to a group of banks and this was due on demand. The obligations to the debenture holders totaled $9,200,000.00 and there was approximately $5,000,-000.00 owed to general creditors. The witness stated that as of that time the corporation had a negative tangible worth. Assuming that the plan of arrangement would be confirmed he stated that there would be significant changes in the capital structure. The first of these would be that the 9.2 million dollars of convertible debentures would be converted into the same value of preferred stock. Also approximately $5,000,000.00 of trade obligations would be converted into the same amount of new convertible debentures. Further, approximately $7,000,000.00 worth of the bank debt would be converted into a like amount of convertible debentures. Approximately $15,000,000.00 of bank debt would be converted from a demand loan into a ten year term loan and approximately $15,000,000.00 of the same would be converted into a three year revolving credit. He stated that this would give KDI a positive tangible worth.

In addition to these changes in the capital structure the plan of arrangement provided that the new debentures issued to the banks and trade creditors would not bear any interest for the first two years and would have an interest rate of four per cent for the following eight years. Of the remaining bank obligations one and one-half million dollars would bear interest at six per cent for

2. A requirement of Section 362 of the Act (11 U.S.C. § 762).

the first two years and the balance would carry interest of three per cent for that period.

The witness stated that in his opinion the creditors of the company under a liquidation would probably receive something in the order of one-quarter to one-half of what he projected they would get through the plan of arrangement. He also discussed the rescission suits which were then pending against KDI. He stated that even if KDI should lose all of these suits and be required to divest itself of the eight subsidiaries involved, while it would have an effect on the business, it would not be substantial enough to affect the success of the plan of arrangement. Matthey also testified that representatives from the Securities and Exchange Commission had visited KDI headquarters and interrogated the management, investigated the contents of various minute books and records of the corporation and had visited with the independent certified public accountants employed by the corporation. He further stated that after the motion to dismiss the Chapter XI proceedings was filed, another representative of the SEC came to Cincinnati and examined their various corporate records and interviewed counsel concerning the proceedings. Mr. Matthey concluded his testimony by saying that in his opinion the plan of arrangement is feasible and in the best interest of the creditors.

Much of the cross-examination of this witness was concerned with the treatment of Class 6 creditors. All of the debts included in Class 6 arose out of the various acquisitions by KDI of operating companies during its period of expansion. Some of the contracts involving these acquisitions contained individual guarantees by KDI of the value of its stock on some future date where stock was used as payment for the subsidiary. While all of the contracts involved in Class 6 were set up as tax free exchanges, there were different provisions in the several agreements. The proposed Chapter XI arrangement put a ceiling on the number of shares of common stock of KDI which would be required to satisfy these guarantees by providing that all debts arising from such guarantees would be satisfied in full by paying a number of shares of the common stock equal to the number of shares of the same stock held by each such creditor on December 31, 1970. It was further provided that the persons who received common stock pursuant to this portion of the plan of arrangement could participate in registration of the stock only if approved by KDI. In some cases the plan would result in substituting "piggyback" rights of registration for what had been mandatory rights to registration in the original contracts.

With respect to the security given to the bank consortium, the witness testified on cross-examination that even if the security were set aside as being a preference the banks would still hold seven-eighths of the claims against the corporation. In his opinion the alteration in the terms of the bank loans was of sufficient benefit to justify the giving of security. In regard to the changes effected in the rights of the Class 6 creditors, the witness testified that for purposes of the plan of arrangement these people were treated as a single group of creditors and it was only incidental that they were also shareholders. They were not listed in Class 6 because they were shareholders, but because they had a particular type of unsecured claim against the corporation which arose out of an acquisition contract. He described the guarantee provisions of the acquisition contracts as guaranteeing a certain amount of money on the date that the guarantee was effective, to be satisfied by the payment of additional stock if the market price of the stock at that time was below the assumed value when the contract of acquisition was made. In answer to a hypothetical question concerning a situation where the seller of one of the subsidiaries had received a relatively small down payment in stock and there was a drastic reduction in market price at the time the final payment was due, the witness agreed that

the rights of the holder of this guarantee would be drastically affected, but stated that it would affect his position because he is a creditor of KDI and not because he is a shareholder. The number of shares of stock he would receive on the settlement date would be substantially less under the plan of arrangement than under his original contract, but the witness insisted that it was his creditor position that was affected and not his position as a shareholder. The debtor-creditor relationship between these persons and KDI arose out of a contract which was entered into before they became shareholders, he stated. Louis Matthey was the only witness called by the debtor and he filed a number of exhibits with his testimony. The creditors' committee called its certified public accountant who expressed general support for the plan of arrangement. The objectors did not produce any witnesses in opposition to the plan but relied entirely on cross-examination to establish their position. The referee took the matter under submission after a day of testimony and argument.

The hearing on the motion to dismiss was held before District Judge David S. Porter on December 13, 1971. As they had done in the hearing before the referee, the movants Beach and Di Rubbio introduced no witnesses. Instead their counsel produced various documents which had been filed as exhibits in the hearing before the referee, and additional documents which were introduced for the first time at the District Court hearing, and called to the attention of the trial judge particular portions of these documents which counsel felt established its right to dismissal. Following this there were extensive arguments. In their objections to the plan of arrangement and on their motion to dismiss the Chapter XI proceedings the appellants maintained that the proposed plan of arrangement was illegal, that it was not feasible and that it was not in the best interests of the unsecured creditors. In the hearing before the referee they were joined by several other Class 6 creditors who claimed only that the plan was illegal and did not question that it was feasible and in the best interests of the creditors generally. These particular creditors did not join in the motion to dismiss, nor did the Securities and Exchange Commission.

On March 9, 1972, the District Judge filed an opinion and order in which he denied the motion to dismiss the proceedings under Chapter XI. In the opinion Judge Porter noted that the movants were among the former owners of businesses acquired by KDI who had rescission suits pending against the corporation. In addition he noted that these same two parties had recently been removed from management positions in the subsidiary which they had formerly controlled. The opinion of the court was based on the record made before the referee in the hearing concerning approval of the plan as well as that made before the District Judge on the motion to dismiss. However, the judge noted that some of the determinations required to be made in one proceeding were different from those required in the other. In reaching his decision, he considered and answered the following five questions:

(1) Does the plan illegally affect shareholders?

(2) Is there a need for a trustee to investigate charges of mismanagement and fraud?

(3) What are the plaintiffs' particular needs and the needs of others in category 6—the need to challenge the security of the banks? What is the need of KDI for a source of new money?

(4) Is there a need for a trustee to protect the public in view of S.E.C.'s inaction?

(5) Is there a need for a trustee because the present plan is not feasible?

In answering the first question in the negative the trial court found that the plan preserves the relative position of each member of Class 6 and that the

rights affected by the plan for Class 6 creditors do not have their origin in stock but in contracts of acquisition. The court found that the classification and treatment of Class 6 creditors was fair and equitable and was one which dealt with contractual debts which were capable of being estimated and liquidated and, therefore, were subject to being materially and adversely affected by a plan of arrangement.

In answering the second question the court noted that KDI already had new management and that there was no public debt. Further the court found that charges of fraud, self-dealing and mismanagement were not supported by any evidence at the two hearings other than exhibits produced by KDI itself. The court was impressed with what had already been accomplished by the new management and stated that many of the steps which a trustee would be expected to take had already been taken by Mr. Matthey and his associates. The court specifically found that there was no improper self-dealing or other breach of fiduciary duty by any of the directors and that no need was demonstrated to investigate the charges that mismanagement had resulted in large losses to the corporation. It was held that these losses had been sufficiently explained by Mr. Matthey and that they had resulted from general economic conditions and mistakes in judgment rather than any wrongdoing. The opinion also noted the active role of the creditors' committee in negotiating with the bank consortium and working closely with the new management in effecting needed changes in the affairs of the corporation.

In answering the third question the District Court analyzed the transaction between the group of banks and KDI and noted particularly that the creditors' committee had concluded that the overall effect of this transaction was beneficial. The court pointed out that the banks as secured creditors were not included in the plan of arrangement and that the information concerning the bank transaction was put there so that everyone would be advised of what had occurred. It was noted that if the proceedings were transferred to Chapter X, KDI would lose the advantageous refinancing of the bank debt and that no other source of operating capital appeared to be available. The court concluded that neither the needs to be served of the appellants nor the needs of others required the appointment of a trustee, but in fact that the needs of the unsecured creditors generally would be disserved by the appointment of a trustee.

In answering question number four the court took note of the fact that representatives of the SEC were very familiar with all the proceedings concerning KDI and had not seen fit to join in the motion to dismiss or transfer to Chapter X. Without drawing any conclusions from this fact alone the court determined that the interests of the public would be properly protected in Chapter XI proceedings and that there was no necessity to appoint a trustee for this purpose.

With respect to question number five the court found that the plan proposed by KDI is "absolutely feasible" and adopted as a test of feasibility the probability of actual performance of the plan as proposed. At this point the opinion reviewed the terms of the plan in some detail and found that it was workable. The court noted the argument made by appellants that the plan is too complex and actually accomplishes a reorganization of KDI rather than a simple arrangement of debt. The court concluded that most of the steps which would normally be taken in a Chapter X proceeding had already been taken by KDI before it came into bankruptcy court. The court determined that the plan only affected unsecured creditors and, considering the needs to be served, no reason for dismissing had been shown.

The standards set by Congress in determining whether a motion under § 328 of the Act should be granted are expressed in the broadest possible terms. A judge "may" grant the motion "if he finds that the proceedings should have

been brought under Chapter 10 of this title." The Supreme Court has dealt with the problem in three cases and all parties to this action agree that the controlling decisions are Securities and Exchange Commission v. United States Realty and Improvement Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940); General Stores Corp. v. Shlensky, 350 U.S. 462, 76 S.Ct. 516, 100 L. Ed. 550 (1956.) and Securities and Exchange Commission v. American Trailer Rentals Co., 379 U.S. 594, 85 S.Ct. 513, 13 L.Ed.2d 510 (1965). This court had the question before it for decision in Securities and Exchange Commission v. Wilcox-Gay Corporation, 231 F.2d 859 (6th Cir. 1956). Only general principles may be drawn from any opinion dealing with this issue, because the fact situation is different and largely determinative of the outcome of each case.

██ One of the most important differences in procedures under the two chapters is that Chapter X requires the appointment of a disinterested trustee to take possession of the assets of the debtor,[3] while Chapter XI permits the debtor in possession to continue to hold the assets and to continue its operations subject to the control of the court.[4] At the outset we must determine, then, whether the record in this particular case reveals a set of facts where the appointment of a trustee would best serve the various interests involved. We believe the District Judge correctly decided this question and his findings on the subject are supported by the evidence. The new management of KDI, headed by Louis Matthey, has moved promptly and skillfully to restore the corporation to a profit-making enterprise with financial stability. The long-term success of these efforts could be seriously hindered, or even completely doomed, by a transfer to Chapter X and the consequent appointment of a trustee. Matthey testified that he would not stay with KDI if this were done and the banks, who are by far the largest creditor as a group,

notified the referee that the adjustment of terms of their loans was contingent upon continued operation under Chapter XI.

██ In addition to supplying new management, a trustee is frequently needed to investigate past mismanagement, fraud or breach of trust by officers or directors. While KDI has suffered from bad management in the sense of poor business judgment and insufficient financial controls and accounting practices, the appellants failed to produce convincing proof of any fraud or bad faith. Several transactions with former directors had the result of relieving KDI of obligations which were connected with the properties sold to these individuals. The record supports the findings of the trial judge that these transactions were openly carried out with full disclosure to other directors who approved them, and that the net effect of each was to strengthen KDI.

Many, if not all the steps which a trustee would be expected to take in the circumstances of this case had already occurred before the petition was filed in the bankruptcy court. The corporation had been substantially reorganized without court assistance, but it needed "breathing room" in order to continue operations. The most pressing debts were the bank loans which were payable on demand. Once these had been transformed into term loans and new working capital had been provided in the revolving credit of $3,000,000.00, KDI maintains it was necessary to resort to the protection of the bankruptcy court to be assured of this "breathing room." Nevertheless, the appellants contend that the proposed arrangement is actually a reorganization and that the capital structure of KDI is too complex for proceedings under Chapter XI. They assert that the proceedings are illegal because the rights of shareholders are materially and adversely affected, that the proposed plan is not feasible and that Chap-

---

3. 11 U.S.C. § 556.

4. 11 U.S.C. § 742–743.

ter XI is not appropriate to the needs to be served in this case.

■ The two statutory methods of accomplishing the rescue of financially distressed corporations "are not alternate routes, the choice of which is in the hands of the debtor. Rather, they are legally, mutually exclusive paths to attempted financial rehabilitation." SEC v. American Trailer Rentals, *supra* 379 U.S. at p. 607, 85 S.Ct. at p. 520. Though the debtor makes the first choice between the remedies of the two chapters, proceedings under Chapter X will not be permitted unless "adequate relief" is not obtainable under Chapter XI;[5] and if the proceedings "should have been brought" under Chapter X, the court must dismiss a petition filed under Chapter XI.[6] In determining which method of rehabilitation should be followed in a given case, the trial court does not have untrammeled discretion, but must make the decision in the light of enunciated principles. The question on appeal is not whether there has been a clear abuse of discretion, but whether the "exercise of discretion transcended the allowable bounds." General Stores Corp. v. Shlensky, *supra* 350 U.S. at p. 468, 76 S.Ct. at p. 520.

■ The Supreme Court has held that the determination of whether a debtor should proceed under Chapter X or XI cannot be based exclusively on the size of the corporation, whether it has few or many security holders or whether its securities are held by the public; although, as a general rule, Chapter X is better adapted to large corporations with complicated balance sheets and numerous shareholders. SEC v. United States Realty and Improvement Co., *supra*. Furthermore, in *General Stores* it was held that neither the character of the debtor nor the nature of its capital structure should be the controlling consideration in making a choice between the two chapters. The decision must be based on the "needs to be served." 350 U.S. at p. 466, 76 S.Ct. 516. The teach-

ings of *United States Realty* and *General Stores* were followed by the District Court and this Court in SEC v. Wilcox-Gay Corp., 133 F.Supp. 548 (W.D.Mich. 1955), 231 F.2d 859 (6th Cir. 1956). While there are important factual differences between *Wilcox-Gay* and the present case, we continue to adhere to its guiding principles without relying directly upon it for our decision. In *Trailer Rentals* the Court reaffirmed the previous holdings that there is no absolute rule that Chapter X must be used when the debtor is publicly owned. Furthermore, if a plan alters the rights of public investors it does not necessarily require proceedings under Chapter X. While holding that Congress had not seen fit to make absolute distinctions based on these considerations, it, nevertheless, laid down the general rule that Chapter X is the "appropriate proceeding for adjustment of publicly held debt." 379 U.S. at p. 613, 85 S.Ct. at p. 524. The opinion goes on to hold that Congress was primarily concerned with the protection of public investors in enacting Chapter X, whereas Chapter XI provides primarily for the adjustment of the rights of trade creditors by way of a "simple composition." p. 614, 85 S.Ct. 513.

There is support for the positions of both the appellants and the appellees in the three Supreme Court decisions. Considered alone *United States Realty* might appear to rule out any possibility of KDI's proceeding under Chapter XI because there is a rearrangement of its capital structure under the proposed plan. However, when *United States Realty* was decided, an arrangement under Chapter XI was required to be "fair and equitable" and the decision seems to rest largely on the court's holding that the proposed plan did not, on its face, meet this test. Since Congress has subsequently removed the "fair and equitable" requirement from Chapter XI proceedings and since the important facts in that case, particularly the exis-

5. 11 U.S.C. § 546(2)

6. 11 U.S.C. § 728

tence of publicly owned debentures are so different from those in the present one, it is impossible to decide this case in reliance on SEC v. United States Realty and Improvement Co., *supra*.

In *General Stores* none of the unsecured trade and commercial debts which were being rearranged was publicly held. In that respect it is similar to the present case because here the debentures (Class 5 under the plan) are too closely held to be classified as publicly held debt securities. The same is also true of the debts arising out of the contractual rights of the Class 6 creditors. Likewise, all of the debts in the first four classes under the plan are trade or commercial debts. However, there are important differences between the cases. There was a long story of financial difficulties, including previous bankruptcy proceedings, in the history of the General Stores Corporation. The financial conditions of the company were so precarious that the proceedings appeared to offer only a short moratorium that "may be merely a prelude to new disasters." 350 U.S. at p. 467, 76 S.Ct. at p. 519. The case was ultimately decided on the finding that no "feasible" plan would be possible under Chapter XI. It was held that the two lower courts did not transcend the allowable bounds of discretion in finding that rehabilitation of the debtor would require a more drastic restructuring of its capital than could be accomplished under Chapter XI.

Turning to the most recent Supreme Court case, we find an obvious and important difference in the debt structure of American Trailer Rental Co. and KDI. There were numerous widely scattered small investors who had purchased trailers and leased them back to the corporation. In fact the business had largely been financed by this sale and lease-back scheme until the Securities and Exchange Commission ruled that the agreements were investment contracts requiring registration as securities. Two previous attempts at public financing had been blocked by the SEC on the ground that materials issued by

the debtor contained false and misleading statements. The financial statement filed with the Chapter XI petition of Trailer Rentals showed an entirely different situation from that disclosed by KDI. There were very few assets beyond an extremely doubtful item listed as its trailer rental system which consisted of agreements with some 500 individual service stations. On the other hand its liabilities consisted of over $900,000.00 owed to investors under the lease-back plan, in excess of $285,000.00 owed to officers and directors and only $71,805.00 owed to trade and general creditors.

A further comparison with *Trailer Rentals* discloses that the plan of arrangement which was proposed by the debtor in that case would have left the old management in control of a successor corporation, the stock of which was being issued in various ratios to the different groups of creditors. In that case the plan also provided for payment in full of an unsecured bank loan which the officers and directors of American Trailer Rental Co. had individually guaranteed. The entire plan appeared to be highly favorable to those persons whose acts had been largely responsible for the plight of the debtor.

In reversing the denial of the motion to dismiss or transfer the proceedings to Chapter X the Court in *Trailer Rentals* found that the proposed arrangement under Chapter XI would materially affect the rights of widespread public investor creditors. This fact alone would have required a Chapter X proceeding. However, the opinion continued:—

"On the other hand, *General Stores* also makes it clear that even though there may be no public debt materially and directly affected, Chapter X is still the appropriate proceeding where the debtor has widespread public stockholders and the protections of the public and private interests involved afforded by Chapter X are required because, for example, there is evidence of management misdeeds for which an

accounting might be made, there is a need for new management, or the financial condition of the debtor requires more than a simple composition of its unsecured debts." 379 U.S. pp. 614–615, 85 S.Ct. p. 524.

The Court also considered the argument that the time and expense involved in a Chapter X proceeding should be weighed against the speed and economy possible under Chapter XI. In ruling that this could not be a determinative consideration, the opinion pointed out that "it must be recognized that Chapters X and XI were not designed to prolong—without good reason and at the expense of the investing public—the corporate life of every debtor suffering from terminal financial ills." 379 U.S. at p. 618, 85 S. Ct. at p. 526.

■ Taking into account the principles enunciated and conclusions reached in the three controlling Supreme Court opinions and the decisions of a number of other courts cited in brief and argument, we have concluded that the judgment of the District Court should be affirmed. None of the debt subject to the plan of arrangement is evidenced by publicly held securities, and it is all unsecured. The proposal to issue convertible subordinated income debentures and convertible preferred stock is a permissible method of providing for the rearrangement of unsecured debts within § 356 of the Bankruptcy Act (11 U.S.C. § 756) which provides for modifying or altering the rights of unsecured creditors "upon any terms or for any consideration." In § 306(2) of the Act [11 U.S. C. § 706(2)] "consideration" is defined as including "evidences of indebtedness, either secured or unsecured, stock and certificates of beneficial interest therein, and certificates of beneficial interest in property."

The appellants are Class 6 creditors under the proposed plan. They complain that the plan will result in their receiving fewer shares of stock of KDI in the future than they contracted for when they sold their company to KDI. This will be true if the market value of KDI stock remains at its depressed level. However, all of the Class 6 creditors are treated the same, and of the 77 proofs of claim representing 760,956 shares of stock received from Class 6 creditors, 67 representing 716,336 shares filed acceptances of the plan. The District Court correctly held that the acquisition contracts dealt with in Class 6 created unsecured debts of KDI, and the fact that these debts were payable in common shares of the corporation does not make them ineligible for modification or alteration under Chapter XI.

A number of cases have been cited by appellants in support of their contention that the proposed proceedings under Chapter XI are illegal. We have examined the decisions and do not find them to be controlling. In two cases decided since *Trailer Rentals* the Eighth and Tenth Circuits have reversed orders of district courts which denied motions, pursuant to § 328, to dismiss proceedings under Chapter XI. The case of In re Peoples Loan and Investment Company of Fort Smith, 410 F.2d 851 (8th Cir. 1969), involved a finance company which had raised most of its capital by selling certificates of deposit to numerous small investors. These public investors constituted a large majority of the unsecured creditors. They were widely scattered and had little knowledge of the operations of the debtor. Furthermore, there was much evidence of mismanagement and self-dealing and an investigation was needed into past relationships between the old management and a corporation which would wind up with control of the debtor under the plan of arrangement. The Court of Appeals held that a disinterested trustee was needed to make these investigations and for the protection of the unsophisticated investor creditors. In the case of Norman Finance and Thrift Corp. v. SEC, 415 F.2d 1199 (10th Cir. 1969), the same result was reached where many of the facts were similar. There were more than six hundred creditors who had invested in "Thrift Savings Accounts."

There was strong evidence again of prior mismanagement, and control of the debtor had passed to an insurance company whose connections with the prior management required investigation. These two cases are distinguishable from the present one both because of the existence of many public investors among the unsecured creditors and the clear need for an investigation by a disinterested trustee.

When KDI came into court it had already taken many drastic and effective steps to correct past mistakes. It was being run by a new management team which had gotten rid of much of the dead wood that had produced its losses of the recent past, and a consolidation and tightening up was in process. Furthermore, a renegotiation of very large and pressing demand bank loans had provided some "breathing room." Although security was given for previously existing loans as part of this transaction, the banks already held seven-eighths of the total indebtedness of the corporation, and the new loans which accompanied the transaction provided the working capital which was needed to keep the company in operation. Immediately after the Chapter XI proceedings began the creditors' committee was organized and professionally staffed and began working on the details of the plan of arrangement.

At the hearing on the plan the debtor was able to report that it was operating at a profit, that virtually all the nonrecurring losses had been absorbed and that prospects for continued successful operation were good. The creditors' committee agreed with this appraisal of the results and projections and an overwhelming number of the creditors approved the plan of arrangement. Faced with this evidence and no testimony to the contrary, the trial judge correctly found that the plan is feasible. Under these circumstances the District Court exercised its discretion within the allowable bounds in holding that the "needs to be served" test was satisfied in this case by proceeding under Chapter XI.

The judgment is affirmed. Appellants will pay the costs.

## APPENDIX I

### PLAN OF ARRANGEMENT

(Filed in Bankruptcy April 6, 1971)

KDI Corporation, the above-named Debtor, proposes the following arrangement with its unsecured creditors:

### ARTICLE I.

### DEFINITIONS

As used in this Plan of Arrangement, unless the context clearly requires otherwise, "Plan" shall mean this Plan of Arrangement, and "Order of Confirmation" shall mean an order by the Referee in Bankruptcy confirming this Plan, with respect to which: either, no petition for review or extension of time for the filing of a petition for review has been filed pursuant to the provisions of Section 39(c) of the Bankruptcy Act (11 U.S.C. Section 67(c)); or such a petition having been filed, same shall have been finally sustained by the appropriate Court.

### ARTICLE II.

### DIVISION OF CREDITORS INTO CLASSES

The unsecured debts of the Debtor are divided into the following classes:

1. *Class 1*. All debts which have priority under Section 64a(2), (4), and (5) of the Bankruptcy Act.

2. *Class 2*. All debts up to and including One Thousand Dollars ($1,000.-00).

3. *Class 3*. All debts in excess of One Thousand Dollars ($1,000.00) and up to and including Ten Thousand Dollars ($10,000.00).

4. *Class 4*. All debts in excess of Ten Thousand Dollars ($10,000.00) except for those debts described in Classes 1, 5 and 6.

5. *Class 5.* All debts owing holders of convertible subordinated notes, debentures or bonds (being those dated December 1, 1968, December 23, 1968 and July 1, 1969).

6. *Class 6.* All debts arising out of individual guarantees by the Debtor of the value of specific consideration exchanged in various specific corporate acquisition contracts.

## ARTICLE III.

## PROVISIONS MODIFYING OR ALTERING THE RIGHTS OF UNSECURED CREDITORS

1. All debts included in Class 1 are to be paid in full in cash within thirty (30) days after the allowance thereof by the Referee in Bankruptcy and the Order of Confirmation, or are to be paid in accordance with such agreement, more beneficial to the Debtor, as may be made between any holder of such a debt and the Debtor.

2. All debts included in Class 2 shall be paid in full in cash (debts greater than One Thousand Dollars ($1,000.00) may be voluntarily reduced to that amount, and the excess waived, by a creditor under this section).

3. All debts included in Class 3 shall be satisfied, at the creditor's option, either:

(A) by payment in cash of fifty per cent (50%) of the debt up to a maximum payment of Five Thousand Dollars ($5,000.00) (debts greater than Ten Thousand Dollars ($10,000.00) may be voluntarily reduced to that amount, and the excess waived, by a creditor under this section); or

(B) by payment in full of the debt in the form of One Hundred Dollars ($100.00), face value convertible four per cent (4%) subordinated income debentures of the Debtor, all of which will be issued in fully registered form as to principal and interest. Such debentures shall be callable, upon ninety (90) days notice, for One Hundred and Five Dollars ($105.00) per debenture, and be due ten (10) years after issuance with no interest earned or due in either of the first two (2) years after issuance unless the profits of the Debtor after all taxes except Federal income tax exceed Ten Million Dollars ($10,000,000.00) for the respective year. Such debentures will be convertible into the Debtor's common stock at the rate of one (1) common share per each Ten Dollars ($10.00) of face value of debenture. Holders of debt in other than amounts divisible by One Hundred Dollars ($100.00) shall receive, at the Debtor's option, either: the next higher whole debenture; or, the proportionate value of such difference in cash.

4. All debts included in Class 4 shall be satisfied by payment in full of the debt in the form of the convertible income debentures of the Debtor described in 3.(B) above.

5. All debts included in Class 5 shall be satisfied by payment to the holders thereof of one hundred per cent (100%) of the debt in convertible preferred stock of the Debtor. Such preferred stock will be a One Hundred Dollar ($100.00) stated value non-cumulative, Four Dollar ($4.00) dividend preferred stock, redeemable by the Debtor upon ninety (90) days notice at One Hundred and Five Dollars ($105.00) per share and will be convertible into ten (10) shares of common stock of the Debtor. No annual dividend may be paid in either of the first two (2) years after issuance unless the profits of the Debtor after all taxes except Federal income tax exceed Ten Million Dollars ($10,000,000.-00) for the respective year.

Majority approval of the preferred stockholders will be required for the sale of any capital assets of the Debtor in excess of Five Million Dollars ($5,000,000.00) over a three (3) succes-

sive year period. Upon non-payment of dividends for two (2) years, voting rights of the preferred shall be equivalent to the voting rights of the number of common shares into which the preferred is convertible. In such case the preferred will vote with the common shares and not as a separate class, except with regard to the majority approval relating to the sale of capital assets.

A right to require the Debtor, at Debtor's expense, to register, under the Securities Act of 1933, both the preferred stock and the underlying common stock into which the preferred is convertible shall be afforded the recipients under Class 5 of the preferred stock. Such right shall be exercisable only once upon the request of a majority (in dollar amount) of any of the predecessor debenture-bond holder groups. Such request may only be exercised where the annual certified audit of the Debtor is the last statement necessary for filing. The right to participate in an S–1 or S–7 registration statement filed by the Debtor shall be afforded the same parties, at no cost to them. Such rights shall be subject to the approval of the Debtor's underwriter, if any, in such registration, and shall apply only if such registration is necessary for the sale of same. At the earlier of: the retirement of the debentures provided for in Class 3; or, the tenth year following issuance of the preferred stock, ten per cent (10%) of the preferred stock will be redeemed annually.

6. All debts included in Class 6 shall be satisfied in full by payment to the holders thereof of a number of shares of the common stock of the Debtor equal to the number of shares of the common stock of the Debtor held by said holder on December 31, 1970, which are subject to a specific unsatisfied guarantee of the Debtor. The number of shares to be delivered shall be further subject to and defined by the terms of the respective holder's corporate acquisition contract. The right to participate in an S–1 or S–7 registration statement filed at any time by the Debtor shall be afforded to the parties receiving common stock hereunder, at no cost to them, subject to the approval of the Debtor's underwriter, if any, in such registration and provided that Debtor's counsel is of the opinion that registration of such particular shares is necessary for the sale of same.

The above shall all be subject to compliance with the Securities Act of 1933 and the Trust Indenture Act of 1939, if necessary.

All of the above debt satisfactions shall occur within thirty (30) days after the allowance thereof by the Referee in Bankruptcy and the Order of Confirmation.

## ARTICLE IV.

### PROVISIONS FOR THE REJECTION OF EXECUTORY CONTRACTS

Within thirty (30) days from the filing of this Plan, this Article IV shall be amended to set forth the rejection by the Debtor of specific executory contracts. Creditors obtaining rights by virtue of rejection of executory contracts shall fall within Class 2, 3 or 4 as applicable.

## ARTICLE V.

### INFORMATION REGARDING BORROWING AGREEMENTS

As of December 31, 1970, the Debtor owed a consortium of banks the principal amount of Thirty-Two Million, Three Hundred Twenty-Nine Thousand, Six Hundred Eighty-Seven Dollars and Fifteen Cents ($32,329,687.15), plus accrued interest from various dates beginning August 15, 1970 and at various rates. There has been an oral agreement reached between the Debtor and said consortium of its banks regarding the debt owing to such banks and the advancement of additional monies. The written expression and consummation of such agreement shall be subject to the

entry of the Order of Confirmation and satisfactory resolution of several lawsuits seeking rescission of corporate acquisition contracts. Such agreement shall, through appropriate written documents, effect a change in the status of the current indebtedness of the Debtor to said banks, approximately Thirty-Four Million Dollars ($34,000,000.00) (including accrued interest), and future indebtedness, certificates of indebtedness (anticipated to be approximately, but not to exceed, Three Million Dollars ($3,000,000.00)) so that said banks will exchange:

(1) Seven Million Dollars ($7,000,000.00) of said indebtedness for an equal face amount of the face amount of the four per cent (4%) convertible income debentures described in Article III, 3.(B) above, receivable by Class 3 and Class 4 debt holders.

(2) Approximately Fifteen Million Dollars ($15,000,000.00) of said indebtedness for a ten (10) year secured term loan at three per cent (3%) interest for the first two (2) years, then six per cent (6%) interest thereafter, with interest paid quarterly, and with principal to be repaid at Three Hundred Seventy-Five Thousand Dollars ($375,000.00) per quarter starting with the third year. The proceeds from any sale of assets shall be applied to reduce first the payment due for the fourth quarter of the tenth year (Three Million, Three Hundred Seventy-Five Thousand Dollars ($3,375,000.00) and then to reduce the balance of the loan in inverse order (i. e., remaining tenth year payments, etc.). If the term loan is reduced by the amount of Five Million Dollars or more within three (3) years from inception, the revolving credit described in (3) below will automatically be extended for an additional three

(3) years at six per cent (6%) interest.

(3) Approximately Fifteen Million Dollars ($15,000,000.00), which amount includes the anticipated future indebtedness of approximately Three Million Dollars ($3,000,000.00) of said indebtedness for a secured revolving credit due in three (3) years with interest on Twelve Million Dollars ($12,000,000.00) of the principal at three per cent (3%), and on the anticipated future indebtedness of approximately Three Million Dollars ($3,000,000.00) of the principal at six per cent (6%), with all interest payable quarterly starting immediately. Such secured revolving credit shall contain a provision requiring reduction of the principal at an accelerated rate related directly to the annual after tax profits of the Debtor.

The above changes will all be subject to agreements between the parties upon mutually satisfactory terms. Interest on the bank obligations described above for the period of December 31, 1970 until the Order of Confirmation, shall be at the rate of six per cent (6%) for the amounts under (2) and (3) above and no interest on the amount of (1) above.

ARTICLE VI.

PROVISIONS FOR PAYMENT OF DEBTS INCURRED DURING PENDENCY OF ARRANGEMENT

All debts incurred after the filing of the petition and prior to the Order of Confirmation shall be paid in full in cash before (with leave of the Court), or within thirty (30) days following, said order, except that the time of payment of all or any part of such debts may be extended by agreement with the creditors to whom such debts are due, and such extended debts shall have priority in payment over the debts affected by this Plan.

## ARTICLE VII.

### PROOFS OF CLAIM

All creditors of the Debtor shall have thirty (30) days after the Order of Confirmation within which to file proofs of claim.

## ARTICLE VIII.

### PROVISIONS FOR RETENTION OF JURISDICTION

The Referee in Bankruptcy shall retain jurisdiction to allow or disallow any and all claims filed herein to which objections are filed by the Debtor.

## ARTICLE IX.

### PROVISIONS FOR PAYMENT OF COSTS AND EXPENSES OF PROCEEDINGS

The costs and expenses of the proceedings shall have priority in payment over the debts affected by this Plan and shall be paid in cash in full from time to time before (with leave of the Court), or within thirty (30) days of entry of, the Order of Confirmation, out of the deposit to be made by the Debtor at the time of the Order of Confirmation in accordance with the following order of priority:

(1) Certificates of Indebtedness— payable according to their terms.

(2) All administrative expenses as approved by the Court, including all Court costs, special mailing charges and duplicating charges; costs of disbursing agent; all other administrative expenses including allowable out-of-pocket expenses and fees of counsel for the Debtor; special counsel for the Debtor in related proceedings and allowable expenses of the creditors' committee including fees and expenses of its counsel and its accountant.